**Billy D. JAMES, Appellant,**

v.

**Susan KLOOS, R.N., Appellee.**

**No. 2–00–283–CV.**

Court of Appeals of Texas,
Fort Worth.

March 28, 2002.

Law Offices of John David Hart, John David Hart, Amy C. Wright, Fort Worth, for appellant.

Davison Rugeley, L.L.P., D. D'Lyn Davison, Wichita Falls, for appellee.

PANEL B: DAY, DAUPHINOT, and HOLMAN, JJ.

## OPINION

LEE ANN DAUPHINOT, JUSTICE.

Billy James appeals a take-nothing jury verdict in the personal injury suit he prosecuted against Susan Kloos. In two issues on appeal, James contends that the trial court: (1) abused its discretion by permitting James's treating physician to testify after he had an ex parte meeting with defense counsel and then by denying James the right to cross-examine the physician about the meeting; and (2) erred when it submitted a jury instruction on new and independent cause when no evidence had been admitted to support the submission. We affirm.

### Background Facts

James had knee replacement surgery at Wichita General Hospital in Wichita Falls on September 1, 1995. The following day, Kloos, a registered nurse, responded when James called for assistance for getting to the bathroom. With the assistance of Kloos and a walker, James walked into the bathroom. James testified that after he was positioned in front of the toilet, Kloos stepped away and left him to sit without assistance; because he had trouble bending his knees, he fell onto the floor, striking the knee that had just been replaced. According to Kloos, James sat down hard on the toilet after his leg slipped. Kloos further testified that James never fell to the floor, but rather merely complained that he twisted his knee when he sat. James and Kloos agree that Kloos examined the incision and stopped the bleeding while in the bathroom.

James was released from Wichita General on September 12, and on September 15, his surgeon removed the staples from the incision. On September 19, however, James was readmitted to Wichita General after his incision reopened. An infectious disease specialist diagnosed James as having two infections in his knee at that time: proteus mirabilis and xanthomonas. James remained hospitalized until October 6.

On December 5, James was admitted to Harris Methodist Hospital in Fort Worth after a specialist in orthopedic infections examined his knee and determined that the knee replacement needed to be removed. Surgeons removed the knee the following day and packed the knee joint with antibiotic mud, which remained in place until the knee was again replaced six weeks later. After the knee was removed, doctors determined that a staph infection had been inside the wound. Staph is caused by a bacterium distinct from both proteus mirabilis and xanthomonas, the bacteria that had previously been identified in James's wound.

### Propriety of Ex Parte Meeting With Physician

Kloos called Dr. Robert McBroom, the specialist who treated the initial infections in James's surgical wound, as a defense witness at trial. Dr. McBroom testified that staph, the infection that caused the removal of the knee replacement, was not caused by the fall. During Dr. McBroom's testimony, James learned for the first time that the doctor had met ex parte with defense counsel prior to trial. Dr. McBroom admitted that he neither saw nor asked to see a release giving him permission to discuss James's treatment with Kloos's attorneys. Upon learning of the meeting, James objected to the witness and requested that McBroom's testimony be stricken. The trial court overruled the objection, denied the motion to strike, and refused to allow James to question Dr. McBroom in front of the jury about the ex parte meeting.

In his first issue, James contends that the trial court abused its discretion when it permitted Dr. McBroom to testify against him. According to James, the ex parte meeting between his doctor and defense counsel violated the rights to privacy guaranteed by both the federal and state constitutions. Texas courts have recognized that the medical records of an individual are within the zone of privacy protected by the United States Constitution.[1] Likewise, the Texas Constitution has been construed to recognize an individual's right to privacy.[2]

James also claims that the ex parte meeting violated the physician-patient privilege recognized in rule 509 of the Texas Rules of Evidence, which protects most communications between a doctor and patient from disclosure. Rule 509 provides:

(c) General Rule of Privilege in Civil Proceedings. In a civil proceeding:

(1) Confidential communications between a physician and a patient, relative to or in connection with any professional services rendered by a physician to the patient are privileged and may not be disclosed.

(2) Records of the identity, diagnosis, evaluation, or treatment of a patient by a physician that are created or maintained by a physician are confidential and privileged and may not be disclosed.[3]

1. *See In re Columbia Valley Reg. Med. Ctr.*, 41 S.W.3d 797, 802 (Tex.App.-Corpus Christi 2001, orig. proceeding); *In re Xeller*, 6 S.W.3d 618, 625 (Tex.App.-Houston [14th Dist.] 1999, orig. proceeding); *Tarrant County Hosp. Dist. v. Hughes*, 734 S.W.2d 675, 679 (Tex.App.-Fort Worth 1987, orig. proceeding).

2. *Tex. State Employees Union v. Tex. Dep't of Mental Health & Mental Retardation*, 746 S.W.2d 203, 205 (Tex.1987) ("We do not doubt, therefore, that a right of individual privacy is implicit among those 'general, great, and essential principles of liberty and free government' established by the Texas Bill of Rights.") (citing TEX. CONST. art. I, Introduction to the Bill of Rights).

3. TEX.R. EVID. 509.

Finally, James argues that the ex parte meeting was improper under the medical practices act, which provides: "A communication between a physician and a patient, relative to or in connection with any professional services as a physician to the patient, is confidential and privileged and may not be disclosed except as provided by this chapter."[4]

Neither the Texas Supreme Court nor this court has directly addressed the propriety of a physician meeting ex parte with an attorney representing a party-opponent of the doctor's patient. The supreme court recognized the specter of the dilemma, though, in *Mutter v. Wood*, a mandamus opinion wherein the court held that a trial court abused its discretion in ordering a plaintiff in a medical malpractice action to sign an authorization permitting the defendant-hospital's attorney to discuss the treatment of the plaintiff's deceased son with the son's physicians.[5] The court based its holding in part on the authorization's failure "to properly balance the competing interests of the parties in the underlying case" inasmuch as it "provides no reasonable method to allow the Mutters to preserve whatever claims of privilege they might have *because it would effectively allow defendant's counsel to question the physicians outside the presence of plaintiffs' counsel.*"[6] Since *Mutter*, other courts have spoken directly on point with differing results. Two federal courts construing Texas law have held that ex parte meetings between a plaintiff's physician and defense counsel are prohibited unless specifically authorized by the patient.[7] Two Texas courts of appeals, though, have held that unauthorized ex parte meetings are not necessarily improper.[8]

### Refusal to Allow Questioning About Ex parte Meeting

James also contends that the trial court compounded the error of allowing Dr. McBroom to testify after the ex parte meeting by refusing to allow him to ask the doctor questions about that meeting. When James asked Dr. McBroom about his understanding of privacy laws, Kloos lodged a relevancy objection, which the trial court sustained. The trial court then instructed James "not to pursue this line of questioning in front of the jury." In his bill of exceptions, James questioned Dr. McBroom about his understanding of privacy laws, whether he saw or asked to see a release, and whether he was a party to

---

**4.** Tex. Occ.Code Ann. § 159.002(a) (Vernon Pamph.2002).

**5.** 744 S.W.2d 600 (Tex.1988, orig. proceeding).

**6.** *Id.* at 600 (emphasis added).

**7.** *Perkins v. U.S.*, 877 F.Supp. 330, 333–34 (E.D.Tex.1995) ("[I]n a personal injury suit a defense lawyer may not contact *ex parte* a plaintiff's non-party treating physician without the plaintiff's authorization."); *Horner v. Rowan Cos.*, 153 F.R.D. 597, 601 (S.D.Tex. 1994) ("[I]n order to preserve the integrity of the physician/patient privilege, a defendant must be limited to the formal methods of discovery enumerated by the Rules of Civil Procedure, absent the plaintiff's express consent to counsel's *ex parte* contact with his treating physicians.").

**8.** *Durst v. Hill Country Mem'l Hosp.*, 70 S.W.3d 233, 237 (Tex.App.-San Antonio 2001, no pet.) (holding that there is no specific rule prohibiting ex parte communications between a plaintiff's treating physician and defense counsel) (citing *Rios v. Tex. Dep't of Mental Health & Mental Retardation*, 58 S.W.3d 167 (Tex.App.-San Antonio 2001, no pet.)); *Hogue v. Kroger Store No. 107*, 875 S.W.2d 477, 481 (Tex.App.-Houston [1st Dist.] 1994, writ denied) (holding that, because the record contained no indication that the physician whose testimony was challenged communicated any privileged information to defense counsel, the trial court could reasonably conclude that their ex parte meeting was not improper).

the suit when he met with Kloos's attorneys. James argued that the examination went to bias, but the trial court again sustained Kloos's relevancy objection Evidence of bias of a witness is both relevant and admissible.[9] At least one Texas court has found error in the exclusion of evidence indicating a physician participated in ex parte meetings with defense counsel without permission from the patient.[10]

## Standard of Review for Evidence Questions

 We review a trial court's rulings in admitting or excluding evidence under an abuse of discretion standard.[11] An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling.[12] To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles.[13] In other words, we must decide whether the act was arbitrary or unreasonable.[14] Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar

circumstance does not demonstrate that an abuse of discretion has occurred.[15]

 Moreover, to obtain reversal of a judgment based upon an error in the trial court, an appellant must also establish that the error probably caused rendition of an improper judgment in the case or probably prevented the appellant from properly presenting the case to the appellate court.[16] In other words, we will not reverse a trial court for an erroneous evidentiary ruling unless the ruling probably caused the rendition of an improper judgment.[17] The complaining party must show that the whole case turned on the evidence at issue.[18] We examine the entire record in making this determination.[19]

## Harm Analysis

Assuming, without deciding, impropriety in the trial court's decisions to allow testimony after the ex parte meeting and to deny James the opportunity to ask questions about the meeting, James has failed to make the requisite showing of harm.[20]

James presents us with two federal cases in support of his contention that we should presume prejudice merely because

---

9. Tex.R. Evid. 613(b); *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992, orig. proceeding).

10. *Harrison v. Tex. Employers Ins. Ass'n.,* 747 S.W.2d 494, 498–99 (Tex.App.-Beaumont 1988, writ denied).

11. *Nat'l Liab. & Fire Ins. Co. v. Allen,* 15 S.W.3d 525, 527–28 (Tex.2000).

12. *Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex.1998).

13. *See Garcia v. Martinez,* 988 S.W.2d 219, 222 (Tex.1999); *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986).

14. *Downer,* 701 S.W.2d at 242.

15. *Id.* at 241–42.

16. TEX. R. APP. P. 44.1(a); *In re D.I.B.,* 988 S.W.2d 753, 756 n. 10 (Tex.1999); *Tex. Dep't of Human Servs. v. White,* 817 S.W.2d 62, 63 (Tex.1991).

17. *Owens–Corning,* 972 S.W.2d at 43.

18. *City of Brownsville v. Alvarado,* 897 S.W.2d 750, 753–54 (Tex.1995).

19. *Jamail v. Anchor Mortgage Servs., Inc.,* 809 S.W.2d 221, 223 (Tex.1991).

20. *See Interstate Northborough P'ship v. State,* 66 S.W.3d 213, 217 (Tex.2001) (applying harm analysis after "[a]ssuming without deciding, for the purposes of this case, that the trial court abused its discretion in excluding the State's evidence").

an ex parte meeting took place.[21] The district court in *Perkins* did hold that prejudice should be presumed in such cases: "Generally, ex parte communication with treating physicians should be presumed prejudicial. At least in jury cases, the normal response should be to strike the physician's testimony, even if no bad faith is involved."[22] The court, however, went on to find that the testimony of the physicians who had been parties to the ex parte meetings was so essential to a fair trial that they must be allowed to testify.[23] Likewise, in *Horner* the district court held that "ex parte interviews like the ones here are impermissible and presumptively prejudicial" and then refused to disallow the testimony.[24]

■ Apparently, both *Perkins* and *Horner* recognized that a party can be prejudiced when his doctor meets with opposing counsel, but that such prejudice may not be severe enough to disallow the doctor's testimony.[25] Thus, prejudice due to an improper meeting does not necessarily mean prejudice at trial, and, therefore, does not mean that an improper verdict necessarily results when a doctor is allowed to testify after such a meeting. Essentially, an appellant must do more than allege presumed prejudice to be entitled to a reversal; as in any other appeal of a trial court's evidentiary ruling, there must be a showing that the ruling probably caused the rendition of an improper judgment.[26]

■ James contends that if we do not presume prejudice, we must nonetheless find harm because Dr. McBroom's testimony was Kloos's only evidence that the staph infection was not caused by James's fall. We must consider, however, that Kloos also presented a defense based on the duty of care. While Kloos did argue in the trial court that an intervening event caused the infection, she also presented evidence that she was not negligent in her care of James. Dr. Ruyle, the physician who performed the September 1 surgery, testified that, assuming Kloos's version of events, Kloos was not negligent. Wanda Phipps and Kathy Wherry, licensed vocational nurses who also cared for James the day of the incident, both agreed that Kloos was not negligent. Dolores Townsend, a registered nurse who worked at Wichita General Hospital but was not involved in James's treatment, testified that Kloos's care of James did not fall below the minimum standard of care. Finally, Robin Lockhart, Kloos's retained expert on nursing, testified that Kloos was not negligent.

Thus, the take-nothing judgment could have been based on the jury's determination that Kloos was not negligent. Given this, James has failed to show that the case turned on the testimony of Dr. McBroom and that the introduction of that testimony in spite of the ex parte meeting probably caused the rendition of an improper verdict. Likewise, we examine the evidence James elicited in his bill of exceptions. The questions dealt with Dr. McBroom's understanding of laws governing the physician-patient privilege. They did not bring forth responses indicating

21. *See Perkins,* 877 F.Supp. at 330; *Horner,* 153 F.R.D. at 597.

22. *Perkins,* 877 F.Supp. at 334.

23. *Id.*

24. *Horner,* 153 F.R.D. at 602.

25. *See also Harrison,* 747 S.W.2d at 498–99 (holding that the trial court erred in refusing to permit cross-examination of a treating physician regarding ex parte meetings with defendant's attorney, but that the error probably did not cause the rendition of an improper judgment).

26. *See Owens–Corning,* 972 S.W.2d at 43.

that Dr. McBroom's testimony had been affected by what occurred during the ex parte meeting or that he communicated any privileged information to defense counsel. Consequently, James failed to establish that had he been able to ask Dr. McBroom questions about the meeting he would have shown bias affecting the verdict. Because James failed to make the requisite showing of harm, based on the limited facts of this case, we overrule James's first issue.

## Jury Instruction

In his second issue, James claims that the trial court erred in submitting to the jury an instruction on "new and independent cause" when no evidence was introduced to support a finding of new and independent cause. On Kloos's motion, the trial court instructed the jury that:

> "New and independent cause" means the act or omission of a separate and independent agency, not reasonably foreseeable by a registered nurse exercising ordinary care, that destroys the causal connection, if any, between the act or omission inquired about and the occurrence in question and thereby becomes the immediate cause of such occurrence.

This instruction tracks state law, which provides that new and independent cause is the act or omission of a separate

and independent agency that destroys the causal connection between the negligent act or omission of the defendant and the injury.[27] New and independent cause is an inferential rebuttal defense that may be submitted to the jury as an instruction.[28] The doctrine is not an affirmative defense; rather, it is one element to be considered by a fact finder in determining whether proximate cause exists.[29]

In determining proximate cause, Texas courts distinguish between a new and independent cause and a concurrent act. A concurrent act cooperates with the original act in bringing about the injury and does not cut off the liability of the original actor.[30] A new and independent cause, sometimes referred to as a superseding cause, however, is an act or omission of a separate and independent agency that destroys the causal connection between the negligent act or omission of the defendant and the injury complained of, and thereby becomes the immediate cause of such injury.[31] An intervening cause that is reasonably foreseeable by the defendant, though, is not a new and independent cause that breaks the chain of causation.[32]

To determine whether an act is a concurring or a new and independent cause, we consider the following factors:

27. See Phoenix Refining Co. v. Tips, 125 Tex. 69, 81 S.W.2d 60, 61 (1935); J. Wigglesworth Co. v. Peeples, 985 S.W.2d 659, 665 (Tex.App.-Fort Worth 1999, pet. denied).

28. J. Wigglesworth, 985 S.W.2d at 665.

29. Dallas Ry. & Terminal Co. v. Bailey, 151 Tex. 359, 250 S.W.2d 379, 383 (1952); Benitz v. Gould Group, 27 S.W.3d 109, 116 (Tex.App.-San Antonio 2000, no pet.).

30. See Boorhem–Fields v. Burlington N. R.R. Co., 884 S.W.2d 530, 536 (Tex.App.-Texarkana 1994, no writ) (citing Bell v. Campbell, 434 S.W.2d 117, 122 (Tex.1968) and Travis v.

City of Mesquite, 830 S.W.2d 94, 98 (Tex. 1992)).

31. See Rodriguez v. Moerbe, 963 S.W.2d 808, 820 (Tex.App.-San Antonio 1998, pet. denied) (citing Young v. Massey, 128 Tex. 638, 101 S.W.2d 809, 810 (1937)).

32. Humble Sand & Gravel, Inc. v. Gomez, 48 S.W.3d 487, 507 (Tex.App.-Texarkana 2001, no pet.); Wolf v. Friedman Steel Sales, Inc., 717 S.W.2d 669, 672 (Tex.App.-Texarkana 1986, writ ref'd n.r.e.).

(a) whether its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;

(b) whether its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;

(c) whether the intervening force operated independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;

(d) whether the operation of the intervening force is due to a third person's act or to his failure to act;

(e) whether the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;

(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.[33]

■■■■■ James contends that the instruction was improper because Kloos presented no evidence to support a new and independent cause finding. He contends: "First, Appellee showed no act of intervening force. Further, no intervening act brought about a harm that was different or extraordinary from what would normally result from Susan Kloos' negligence." We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard.[34] A trial judge must submit a requested jury question if it is supported by some evidence, but may refuse to do so if it is not supported by any evidence.[35]

■■■■■ James presented the following theory to the jury: Kloos was negligent in her care of James in the bathroom; Kloos's negligence caused James's surgical wound to open in an unsterile environment; James's wound failed to heal properly because of the trauma of the fall; and the infections to the wound resulted either from exposure to bacteria in the bathroom or from James having an open wound for a prolonged time. James's trial counsel explained to the jury that the staph infection that led to the removal of the knee "was a natural, continuous sequence and in no way has anything happened that destroyed what was caused by Billy's fall, that was caused by Susan Kloos's negligence."

Kloos, in turn, argues that the instruction was proper because the evidence shows that the staph infection that led to the removal of the prosthesis could have been caused by something other than the incident in the bathroom. To support this argument, Kloos points to several witnesses' testimony. According to Kloos, the testimony of the doctors and nurses involved in James's care as well as that of the expert witnesses, when taken together, constitutes evidence that the staph infection did not necessarily result from Kloos's alleged negligence.

Specifically, Kloos enumerates various witnesses' testimony that there was not a "gaping hole" in James's knee immediately following the incident and Dr. Ruyle's testimony that when he removed the staples from the knee on September 15, the wound "looked good" except for some shallow separation and then "just seemed to open up" on September 18. Kloos also relies on Dr.

---

**33.** *Humble Oil & Refining Co. v. Whitten,* 427 S.W.2d 313, 315 (Tex.1968); *Knoll v. Neblett,* 966 S.W.2d 622, 634 (Tex.App.-Houston [14th Dist.] 1998, pet. denied).

**34.** *See Tex. Dep't of Human Servs. v. E.B.,* 802 S.W.2d 647, 649 (Tex.1990).

**35.** *See* Tex.R. Civ. P. 278; *Elbaor v. Smith,* 845 S.W.2d 240, 243 (Tex.1992).

Ruyle's statement that the type of injury James suffered could occur in normal activity and on the lack of evidence of a staph infection during the first hospitalization. Finally, Kloos points to various experts' testimony that a staph epidermis infection can be easily contracted because everyone has it on their skin and to James's expert's testimony that joint replacements may be infected when they are put into the knee and that infection can result from the interface of a prosthesis and cement. Kloos contends that this testimony "contradicts Appellant's position that the only possible cause of injury . . . must be a bacteria from the bathroom caused when the September 2 incident occurred."

While the evidence Kloos relies on may contradict James's position that Kloos was negligent, it does not establish an act or omission of a separate and independent agency that destroyed the causal connection between Kloos's allegedly negligent act and James's injury. Essentially, Kloos failed to present any evidence that James's injury was not a reasonably foreseeable result or natural consequence of the incident in question. Consequently, the trial court erred in submitting the requested jury question.[36]

■■■■■ Again, to obtain reversal of a judgment based upon an error in the trial court, an appellant must show that the error probably caused rendition of an improper judgment in the case.[37] It is a rare case in which the incorrect inclusion of "new and independent cause" in the jury charge is reversible error.[38] To determine whether the instruction probably caused an improper judgment, however, we examine the entire record.[39] An improper instruction is especially likely to cause an unfair trial when the trial is contested and the evidence is sharply conflicting.[40]

■■■ The record here establishes that the trial was contested. Conflicting testimony was presented on the standard of care, causation, and even the circumstances surrounding the underlying event. However, while conflicting testimony is a factor that increases the odds that an improper instruction will be harmful, we need more than the presence of conflicting testimony to determine whether the improper instruction *probably* caused the rendition of an improper judgment. In fact, there are suggestions in the record that the improper instruction likely had little effect. The record reflects no less than sixteen pages of closing argument by Kloos's attorney addressing whether Kloos was negligent and only seven pages discussing proximate cause, with only two explicit mentions of new and independent cause.[41]

James contends that harm is evident in the jury's "no" answer to the first jury question: "Did the negligence, if any, of those named below proximately cause the injury in question?" In coming to this conclusion, James relies upon *Galvan v.*

**36.** *See* Tex.R. Civ. P. 278.

**37.** TEX. R. APP. P. 44.1(a); *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001).

**38.** *Knoll*, 966 S.W.2d at 634; *Galvan v. Fedder*, 678 S.W.2d 596, 599 (Tex.App.-Houston [14th Dist.] 1984, no writ); *N. Tex. Producers Ass'n v. Stringer*, 346 S.W.2d 500, 507 (Tex. Civ.App.-Fort Worth 1961, writ ref'd n.r.e.).

**39.** *Timberwalk Apartments Partners, Inc. v. Cain*, 972 S.W.2d 749, 756 (Tex.1998).

**40.** *Quantum*, 47 S.W.3d at 480.

**41.** *See Reinhart v. Young*, 906 S.W.2d 471, 474 (Tex.1995) (considering the emphasis placed upon the improper instruction in closing argument as a factor in determining harm).

*Fedder*,[42] a Fourteenth Court of Appeals case where the court found harm in the erroneous submission of a new and independent cause instruction. In *Galvan*, the court held that harm was evident in the jury's answer of "no" to a question on proximate cause after a "yes" answer to the general negligence question, opining that the "jury's negative answer to proximate causation reflects its confusion with regard to the submission of 'new and independent cause.' "[43]

We hold *Galvan* to be distinguishable. The court in *Galvan* premised its holding in part on a determination that the evidence left "little doubt" that the defendant doctor's negligence set in motion the sequence of events that led to the death of his patient.[44] The jury here made no finding of negligence, and, as discussed above, the record contains conflicting testimony on the question of Kloos's negligence. We simply cannot be as certain as the *Galvan* court that there was negligence or that any negligence proximately caused the injury at issue. Further, the jury was not asked separate questions on negligence and new and independent cause; rather, negligence and proximate cause were combined into a single inquiry, to which the jury responded "no." As discussed above, Kloos presented substantial evidence that she was, in fact, not negligent in her care of James, and emphasized this evidence in her closing arguments. Given this, the jury's "no" answer to the question "[d]id

the negligence, if any, of those named below proximately cause the injury in question" could very well have been based on its determination that Kloos was not negligent. While the submission of a single question on negligence and proximate cause means that the jury could have based its verdict either on the improper proximate cause instruction or on a finding of no negligence, the mere possibility does not satisfy the proof requirement to establish reversible error.

In sum, James has failed to identify any evidence in the record suggesting that the verdict was *probably* a result of the inclusion of the improper instruction. We, therefore, are not compelled to conclude that the jury was confused by the improper submission of the new and independent cause instruction and that James was harmed. Because James has failed to show that the submission of the instruction probably led to the rendition of an improper verdict, we overrule his second issue.

### Conclusion

Because we have overruled both of James's issues, we affirm the judgment of the trial court.

---

42. 678 S.W.2d at 598–99.

43. *Id.* at 599.

44. *Id.*