COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| DORIS PENROD, | § | No. 08-07-00121-CV |
|  | § |  |
| Appellant, | § | Appeal from |
|  | § |  |
| v. | § | County Court at Law No. 5 |
|  | § |  |
| DAVID R. SCHECTER, M.D., | | of El Paso County, Texas |
| INDIVIDUALLY AND D/B/A | § | |
| SCHECTER AND BLUMENFELD, P.A., | | (TC # 2005-206) |
|  | § |  |
| Appellees. | | |

**O P I N I O N**

Is it reversible error to permit a jury to decide a case based on an instruction that is neither supported by the evidence, intended by the trial court, nor properly defined? Because we conclude that it is, we reverse and remand.

**FACTUAL SUMMARY**

Doris Penrod appeals from a take nothing judgment entered in favor of David R. Schecter, M.D., Individually, and d/b/a Schecter and Blumenfeld, P.A., following a jury trial on her medical malpractice claim.

**The Events at Dr. Schecter's Office**

On August 6, 2003, Jessica Penrod took her grandmother, Doris Penrod, to a surgical center for cataract surgery. Penrod was scheduled to undergo cataract surgery on her left eye with Dr. Schecter. At approximately 11:30 a.m., Cesar Berdeja, M.D., an anesthesiologist, administered a retrobulbar injection of anesthesia. The injection caused a small retrobulbar hemorrhage (RBH) about the size of a dime in the superior portion of Penrod's eye. RBH is a rare complication,

occurring in less than 2 percent of patients who receive a retrobulbar injection, and of this subset, about .025 percent suffers damage to the optic nerve.[1] RBH can cause pressure to build up behind the eye which the body relieves by allowing the eye to move forward against the eyelid. The optic nerve has some elasticity which enables the eye to push out to relieve pressure. In that instance, a rise in the intraocular pressure will not occur. The bleeding often stops due to clotting or from the increasing pressure which tamponades the bleeding. If the RBH continues to bleed, the pressure can increase to the point that the patient is at risk for injury to the optic nerve.

Dr. Berdeja observed the RBH for fifteen to twenty minutes. The size of it did not change during this period of observation. Dr. Berdeja took Penrod into the operating room and Dr. Schecter examined the RBH under a microscope for three to five minutes. The RBH did not change and had tamponaded. Dr. Schecter did not observe any swelling of the eyelids, redness in the eye, ecchymosis[2], discoloration of the eye, or proptosis.[3] He specifically examined Penrod's eyelids to determine if there was room for the eye to push out and relieve the pressure. Dr. Schecter observed that the eyelids were not taut. Based on his clinical evaluation, he did not believe there was a need to use the tonometer to assess intraocular pressure. Nevertheless, Dr. Schecter canceled the cataract surgery due to the risk of complications. A shield and eyepatch were placed over the eye and Penrod was discharged at approximately 2 p.m. with instructions to apply an ice pack to the eye for two to three hours and to call Dr. Schecter if she had any problems. She was also instructed to return to Dr. Schecter's office the following morning.

**Penrod Leaves Dr. Schecter's Office**

---

[1] At the time of trial, Dr. Schecter had seen about twenty-five cases of RBH during his twenty-five year career.

[2] A bruise or contusion is sometimes referred to by doctors as ecchymosis. It involves injury to tissues in which the capillaries are damaged, allowing blood to seep into the surrounding tissue.

[3] Proptosis is a bulging of the eye anteriorly out of the orbit.

Jessica drove Penrod to a podiatrist's office where Jessica's mother, Lily Penrod, worked. The trip from the surgical center to Lily's place of employment took twenty to twenty-five minutes. When they arrived, Jessica could see redness around the eyepatch which had not been there when they were at Dr. Schecter's office. Lily removed the eyepatch and shield and saw a large hemorrhage around the eye. Lily's employer looked at the eye and recommended that she take Penrod to a hospital. Lily instead decided that Jessica should drive Penrod home. Afterward, Penrod began complaining of severe pain. Jessica claimed that she called Dr. Schecter that afternoon to report that Penrod was experiencing extreme pain and asked whether she should take Penrod to the hospital. Dr. Schecter purportedly told Jessica not to go to the hospital and instructed her to return Penrod to his office the following morning. He also told Jessica to give Penrod some Tylenol 3. Dr. Schecter denied speaking with Jessica that afternoon and denied prescribing Tylenol 3. He would not have advised Jessica against taking her grandmother to the hospital.

### The Second Visit and the Aftermath

Penrod, accompanied by Jessica, returned to Dr. Schecter's office the following morning. There was substantial bruising around the eye and Penrod had no vision--only light perception. She could not identify two fingers held up in front of her. Dr. Schecter concluded that Penrod had suffered a rebleed after she left his office the previous day. He prescribed Lumigan drops and Neptazine, which are used to lower intraocular pressure. Jessica took Penrod home but she continued to suffer from significant eye pain. Jessica called Dr. Schecter around 1 p.m. that afternoon and he advised her to take Penrod to the hospital and to tell the emergency room staff to call him. Penrod did not present at the ER until 6 p.m. that evening and the ER staff did not call Dr. Schecter until approximately 2:30 a.m. He went directly to the ER and examined the eye. The proptosis appeared the same and Dr. Schecter concluded that Penrod's eye pain was due to swelling

of the conjunctiva and stretching of nerve endings. He discussed performing a lateral canthotomy[4] but did not believe it was necessary.

Penrod returned to Dr. Schecter's office a week later. The vision in the left eye had not improved. Dr. Schecter measured the intraocular pressure using the tonometer and determined that it was normal. When Penrod's vision did not improve after three weeks, Dr. Schecter sent her to a specialist, Dr. Roy Levit, to determine whether she had optic nerve or retinal damage. Dr. Levit found that Penrod did not have macular or retinal changes but she had severe ischemic optic atrophy. RBH is one possible cause of ischemic optic atrophy, but Dr. Levit opined it could also be caused by toxicity resulting from the injection, or blockage in a blood vessel from the injection.

### The Experts

At trial, Penrod offered the testimony of Oliver Schein, M.D., a professor of ophthalmology at the Wilmer Eye Institute at Johns Hopkins University. Dr. Schein spends about one-half of his time in direct patient care with most of the remainder of his time devoted to clinical research. His expertise is in the anterior segment of the eye and he primarily specializes in cataract, cataract surgery, and complications of cataract surgery. Dr. Schein explained to the jury the structures of the eye and the function of those structures, including the optic nerve. The optic nerve requires oxygen to survive. Consequently, if the blood supply to the optic nerve and its coating is diminished from compression for a long enough period of time, then the nerve will cease to function and will result in loss of vision. When a retrobulbar injection is made, the needle is inserted between the bone and the eye into the space behind the eye. It is possible that the needle could encounter and lacerate a blood vessel. Because the space behind the eye is enclosed, it fills up with blood within seconds and there is no place for the blood to escape. As a result, it seeps forward and can be seen in the upper

---

[4] A lateral canthotomy is a surgical division of the outer canthus to release the accumulated blood.

and lower eyelids and in the white part of the eye. The bleeding often stops because the pressure tamponades the lacerated vessel, but pressure is also placed on the eye itself.

Dr. Schein viewed a photograph of Penrod taken by her grandmother on August 6, 2003, the day of surgery. The upper and lower lids are dark with blood and the eye is swollen and protruding from pressure. In Dr. Schein's expert opinion, the standard of care required Dr. Schecter to measure intraocular eye pressure through the use of a tonometer. If the pressure is substantially elevated, the appropriate intervention would be to perform a procedure known as a lateral canthotomy which involves cutting a tendon in the eyelid to create an opening for the blood to move forward and reduce pressure on the eye. If that failed to reduce the pressure, a small opening could be made in the eye to remove some of the aqueous. Dr. Schein acknowledged that there are medicines which can bring the pressure down but they take thirty to sixty minutes to work. Dr. Schein believed that Dr. Schecter's method of detecting elevated eye pressure--moving the eyelid to determine mobility-- was not an assessment at all because the pressure could be elevated even where the eyelid is mobile. On cross-examination, he admitted that clinical observation of eyelid elasticity is part of an assessment, but he maintained that mere observation is inadequate and Dr. Schecter should have used a tonometer. In his opinion, Dr. Schecter did not do enough to determine whether a lateral canthotomy should have been performed.

Dr. Schein also testified that there could be compression of the optic nerve even in the presence of a normal eye pressure reading. Thus, the standard of care also required Dr. Schecter to evaluate Penrod's vision and the response of her pupils to light four to six hours after surgery. Due to the anesthesia injection, it is impossible to measure vision until the anesthesia wears off. According to Dr. Schein, damage to the optic nerve from compression could occur in an hour or two, or occur over a longer period of time. He could not state whether the damage to Penrod's optic nerve

occurred two hours after the RBH or twenty-four hours later. Dr. Schecter did not examine her vision until the following day approximately twenty-four hours after the retrobulbar injection. If her vision was poor at this time, a physician should be concerned about compression of the optic nerve. In such a case, a CAT scan of the eye would be the next step. Finally, a physician should perform surgery to evacuate the blood accumulated behind the eye. All of these procedures should be done within twenty-four hours of the retrobulbar injection. In Dr. Schein's opinion, Penrod's loss of vision could have occurred through two mechanisms: increased intraocular pressure or compression of the optic nerve from blood accumulated in the back of the eye. Further, he opined that it was reasonably foreseeable that Dr. Schecter's failure to measure the intraocular pressure and evaluate her vision led to damage of the optic nerve and loss of vision. Dr. Schein acknowledged that damage to the optic nerve following RBH could occur without negligence.

Dr. Schecter offered the expert testimony of Bernard A. Milstein, M.D., the Clinical Professor of Ophthalmology at the University of Texas Medical Branch in Galveston. Dr. Milstein devotes approximately 95 percent of his time to patient care, and in the last fifteen to twenty years, his practice has centered around cataract surgery and intraocular lens implantation using Verisyse Phakic and Lasik surgery. Dr. Milstein averages 400 to 500 cases of cataract surgery per year and he has extensive experience with retrobulbar injections. Dr. Milstein explained for the jury how a retrobulbar injection is performed and he described the potential complications which could occur. In addition to an RBH, the optic nerve can be damaged by the injection itself or the anesthetic can cause a toxic injury. He could not determine which of these events caused Penrod's optic nerve atrophy. In his opinion, if Dr. Berdeja injected the optic nerve or if the anesthetic caused a toxic injury, Dr. Schecter could not have taken any action which would have prevented damage to the optic nerve. It has been postulated that if there is pressure behind the eye from the blood pushing

the globe forward, the pressure of the eye against the lids can cause pressure inside the eye . Dr. Milstein agreed with Dr. Schecter that an ophthalmologist can assess whether there is too much pressure behind the eye by feeling the tensile pressure on the lids. If the lids are taut, a lateral canthotomy can be performed to reduce or relieve the pressure on the lids and allow the globe to move forward. If there is no pressure on the lids from the eye, then there is no reason to use a tonometer or to perform the lateral canthotomy. Based on his review of the records and the evidence presented to him, Dr. Milstein concluded that a reasonably prudent ophthalmic surgeon would not have used a tonometer on the day of surgery given the absence of tautness in the eyelids. Dr. Milstein also found that a reasonably prudent ophthalmologist would have released Penrod with instructions to call if a problem arose and to return to the office the following day.

### The Charge Conference

During the charge conference, Dr. Schecter's counsel objected to the court's failure to include an instruction on "new and unexpected cause."[5] The court denied that request. Immediately after that ruling, Penrod's counsel pointed out that the proximate cause definition included in the charge had the "unbroken by any new and independent cause" language in it. The court cut counsel off, stating that Dr. Schecter's counsel had requested an instruction on unavoidable accident and said, "Let's just not waste time." The court's charge included the following definition:

> 'PROXIMATE CAUSE', when used with respect to the conduct of DAVID R. SCHECTER, M.D., means that cause which, in a natural and continuous sequence, *unbroken by any new and independent cause*, produces an event, and without which

---

[5] In his brief on appeal, Dr. Schecter maintains that he did not request an instruction on new and independent cause but instead requested an unavoidable accident instruction. In his first amended answer, Dr. Schecter raised numerous defensive matters, including both unavoidable accident and new and independent cause. Prior to trial, Dr. Schecter filed his requested definitions and instructions which included an instruction on new and independent cause. The record before us reflects that Dr. Schecter indeed tendered a written instruction on unavoidable accident which the trial court denied during trial. Counsel's objection to the absence of a "new and unexpected cause" instruction sounds more like "new and independent cause" than "unavoidable accident," but the record does not include a written request for a "new and independent cause" instruction.

cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that an ophthalmic surgeon exercising ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event. [Emphasis added].

The jury found that the negligence, if any, of Dr. Schecter did not proximately cause the occurrence in question. Penrod filed a motion for new trial complaining that the inclusion of the "new and independent cause" language in the proximate cause instruction was erroneous. At the hearing on the motion for new trial, the trial judge admitted that it was not his intention to leave that language in the definition since he had denied Dr. Schecter's request for an instruction on "new and independent cause." He had noticed the error when he was reading the charge to the jury. The court also observed that Penrod's counsel had attempted to bring the error to his attention but he was focused on something else at the time.

> **Trial court:** And for the record, it was the Court's mistake to leave that wording in under proximate cause because I had found not to instruct them on new and independent cause. You did point it out to me; however, I think I was looking at something else at the time and, frankly, as I was reading the charge, I realized that that shouldn't have been in there in proximate cause. And then I know Mr. Hicks argued that.
>
> So, for the record, the Court did make a mistake in leaving that in the definition of proximate cause. Whether that's harmful error or no error at all, we'll see.
>
> * * * * *
>
> **Trial court:** And frankly, my mind was some place else, but he's telling me, "If you leave it in there," quote, "unbroken by any new and independent cause," because you assumed that you were going to get the inferential rebuttal.
>
> So, I've got my mistake and then rightfully so, rightfully so, I don't think you did anything wrong in arguing it because it's there. I gave it to you. So I don't know if that compounds or magnifies my error.
>
> * * * * *
>
> **Trial court:** And, for the record, whoever reads this record upstairs, I never intended

for that to go in. I made a mistake. Now, whether that's harmful or harmless is for somebody else to decide.

Ultimately, the trial court denied the motion for new trial and this appeal follows.

## PROXIMATE CAUSE INSTRUCTION

In two related issues for review, Penrod contends that the take nothing judgment should be reversed because of the erroneous inclusion of the "new and independence cause" language in the definition of proximate cause. Dr. Schecter responds that the definition did not misstate the law. Alternatively, he argues that the error is harmless.

### Preservation of Error

Dr. Schecter did not raise preservation of error in his brief, but he asserted at oral argument that Penrod has waived her complaint about the proximate cause instruction. Rule 274 of the Texas Rules of Civil Procedure provides:

> A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections. When the complaining party's objection, or requested question, definition, or instruction is, in the opinion of the appellate court, obscured or concealed by voluminous unfounded objections, minute differentiations or numerous unnecessary requests, such objection or request shall be untenable. No objection to one part of the charge may be adopted and applied to any other part of the charge by reference only.

TEX.R.CIV.P. 274. Under Rule 272, the trial court is required to rule on objections to the charge before reading the charge to the jury. *See* TEX.R.CIV.P. 272. This rule also imposes a presumption that "the party making such objections presented the same at the proper time and excepted to the ruling thereon." *Id.* The Texas Supreme Court has held that Rule 272's presumptive provision means that if an objection is articulated and the trial court makes no change in the charge, the objection is, of necessity, overruled. *Acord v. General Motors Corp.*, 669 S.W.2d 111, 114 (Tex.

1984).  Rule 33.1(a)(2)(A) of the Texas Rules of Appellate Procedure is consistent with the *Acord* decision because it permits error to be preserved by either an express or implicit ruling on an objection.  *See* TEX.R.APP.P. 33.1(a)(2)(A).

It is undisputed that Penrod's attorney specifically objected to the inclusion of the "unbroken by any new and independent cause" language in the proximate cause instruction.  The trial court cut counsel off stating, "She requested one on unavoidable accident.  Let's just not waste time."  The court then instructed defense counsel to proceed.  Because the definition of proximate cause included the language objected to by Penrod, we conclude that the court impliedly overruled the objection.  Therefore, Penrod preserved error under *Acord* and Rule 33.1(a)(2)(A).

**Standard of Review**

Rule 278 requires the trial court to "submit the questions, instructions and definitions in the form provided by Rule 277, which are raised by the written pleadings and the evidence." TEX.R.CIV.P. 278. We review an allegation of jury charge error for an abuse of discretion. *Texas Department of Human Services. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990); *Alfiji, S.A. de C.V. v. Woodal*, 280 S.W.3d 897, 899-900 (Tex.App.--El Paso 2009, no pet.). A trial court abuses its discretion by acting arbitrarily, unreasonably, or without consideration of guiding principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003).

**New and Independent Cause**

New and independent cause is a component of the proximate cause issue. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009), *citing Dallas Railway & Terminal Co. v. Bailey*, 151 Tex. 359, 250 S.W.2d 379, 383-84 (Tex. 1952)("The theory of new and independent cause is not an affirmative defense; it is but an element to be considered by the jury in determining the existence or non-existence of proximate cause."). A new and independent cause of an occurrence is the act or omission of a separate and independent agent, not reasonably foreseeable, that destroys the causal connection, if any, between the act or omission inquired about and the occurrence in question. *Columbia Rio Grande Healthcare, L.P.*, 284 S.W.3d at 856.

If the act or omission alleged to have been a new and independent cause is reasonably foreseeable at the time of the defendant's alleged negligence, the new act or omission is a concurring cause as opposed to a superseding or new and independent cause. *Id.* at 857; *Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 451 (Tex. 2006). A new and independent cause alters the natural sequence of events, produces results that would not otherwise have occurred, is an act or omission not brought into operation by the original wrongful act of the defendant, and operates entirely

independently of the defendant's allegedly negligent act or omission. *Columbia Rio Grande Healthcare, L.P.*, 284 S.W.3d at 857.

## Is the Definition Erroneous?

An instruction is proper only if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence. *Columbia Rio Grande Healthcare, L.P.*, 284 S.W.3d at 855; *El Paso Refining, Inc. v. Scurlock Permian Corporation*, 77 S.W.3d 374, 388 (Tex.App.-- El Paso 2002, pet. denied). The definition of proximate cause submitted to the jury fails on all accounts. It does not assist the jury because it includes the phrase "unbroken by any new and independent cause" without any explanatory provisions. Further, the definition does not accurately state the definition of proximate cause applicable in this case. Finally, Dr. Schecter's answer raised the issue of new and independent cause, but the evidence did not support its submission to the jury. We understand Dr. Schecter to posit that the new and independent cause is the rebleed which occurred after Penrod left the surgical center. While there is some evidence in the record that the RBH had tamponaded before Penrod left the surgical center and began to rebleed sometime after she left, there is no evidence of what act or omission caused the rebleed. Thus, there is no evidence that the act or omission which caused the rebleed was not brought into operation by the original wrongful act of the defendant. There is no evidence that the rebleed altered the natural sequence of events, produced results that would not otherwise have occurred, or that it operated entirely independently of the defendant's allegedly negligent act or omission. We therefore conclude that the definition of proximate cause is erroneous because it included the "unbroken by new and independent cause" language.

## Is the Erroneous Definition Harmful?

We turn now to a harm analysis. A judgment will not be reversed for charge error unless the

error was harmful because it probably caused the rendition of an improper verdict or probably prevented the petitioner from properly presenting the case to the appellate courts. TEX.R.APP. P. 44.1; *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 723 (Tex. 2003); *Alfiji, S.A. de C.V.*, 280 S.W.3d at 900. Charge error is generally considered harmful if it relates to a contested, critical issue. *Columbia Rio Grande Healthcare, L.P.*, 284 S.W.3d at 856.

The record reflects that causation was a contested, critical issue at trial. Penrod's expert, Dr. Schein, testified that the standard of care required an ophthalmologist to evaluate the patient's eye pressure and vision following the RBH and for several hours afterward to ensure that the optic nerve had not been damaged. In Dr. Schein's expert opinion, it was likely that Penrod's eye pressure was high as a result of the RBH, such that Dr. Schecter's failure to measure intraocular pressure resulted in a failure to treat elevated pressure which in turn resulted in optic nerve damage and loss of vision. Dr. Schecter, on the other hand, testified that the standard of care did not require him to continue to evaluate Penrod on the day of the scheduled surgery. Dr. Milstein agreed that a reasonably prudent ophthalmologist would have released Penrod with instructions to call if a problem arose and to return to the office the following day. Both Drs. Schecter and Milstein believed that Penrod experienced a rebleed after she left the surgical center.

Penrod maintains that the erroneous definition of proximate cause probably caused the rendition of an improper judgment because it permitted Dr. Schecter to advocate a defensive theory otherwise unavailable to him. In support of her contention, Penrod points to the following portion of defense counsel's final argument:

> Proximate cause says, 'That cause which in a continuous sequence unbroken by any new or independent cause produces an event.' Unbroken by any new or independent cause. There was a new independent cause. A new independent cause is whatever caused it to rebleed. That is what broke. Even if you think Dr. Schecter should have used the tonometer, after she left his care, after the nurses from the surgical center

saw her, after he saw her, something happened that she had a rebleed. That's a new and independent cause that occurred. If you get to Question Number One, it says: Did the negligence of David R. Schecter, M.D. proximately cause the occurrence in question? My suggestion is that the answer to that is no. If you answer no, then you're done.

Defense counsel seized upon the inadvertent but erroneous language in the jury charge to argue that "whatever" caused the re-bleed after Penrod left the surgical center was a new and independent cause, and therefore, the jury should find that Dr. Schecter's negligence, if any, did not proximately cause the occurrence in question.[6] This argument could not have been made absent the defective proximate cause instruction. The argument is significant because it provided a defense to Penrod's claim that Dr. Schecter failed to monitor the RBH complication. While defense counsel argued, based on the evidence, that the standard of care did not require Dr. Schecter to continue to monitor Penrod's condition on the day of surgery, the defective proximate cause definition permitted counsel to sidestep Dr. Schein's expert opinion that Dr. Schecter should have continued to monitor the complication. Instead, he was able to argue that there was a new and independent cause for the rebleed, albeit that the "whatever caused it to rebleed" was never identified.

Dr. Schecter contends that the error is harmless because the jury could have rejected Dr. Schein's testimony given the testimony about alternative causes for Appellant's loss of vision that were unrelated to Dr. Schecter's conduct. He cites *James v. Kloos*, 75 S.W.3d 153 (Tex.App.--Fort Worth 2002, no pet.) in support of his argument. There, the trial court granted the defendant's request for an instruction on new and independent cause. The court of appeals determined that the instruction should not have been given because the defendant failed to present any evidence of an act or omission of a separate and independent agency that destroyed the causal connection between

---

[6] We agree with the trial court's assessment that counsel did nothing wrong in arguing the issue because the language was indeed included in the charge.

the defendant's allegedly negligent act and the plaintiff's injury. *Id.* at 163. Thus, the defendant did not offer evidence that the plaintiff's injury was not a reasonably foreseeable result or natural consequence of the incident in question. *Id.* at 162-63. The court determined, however, that the instruction was not harmful because defense mentioned new and independent cause only twice in sixteen pages of argument and it could not be determined that the improper instruction resulted in an improper judgment. *Id.* at 163-64.

*James* is factually distinguishable. The trial court there intentionally submitted a properly worded instruction on new and independent cause. As it turned out, the charge should not have been given. Here, the trial court did not instruct the jury on new and independent cause but inadvertently left the new and independent cause language in the definition of proximate cause. In the absence of an instruction to guide the jury's consideration of new and independent cause, the jury was able to disregard whether Penrod's injury was a natural consequence of Dr. Schecter's failure to monitor the complication if it found, at defense counsel's urging, that *something* caused it to rebleed after she left the surgical center.

## CONCLUSION

Under the unique facts presented, we conclude that the charge error probably caused the rendition of an improper verdict. Accordingly, we sustain Issues One and Two and remand the cause for a new trial.

November 12, 2009

             ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Rivera, JJ.