COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-08-148-CV

 

 

NANCY
BENISH, R.N., F.N.P.-C.;                                          APPELLANTS

CHRISTINE LASHELL HOPSON,
R.N.;

AND LEONARD T. DINGLER,
M.D.

 

 

                                                   V.

 

AMANDA
GROTTIE, INDIVIDUALLY                                         APPELLEES

AND AS HEIR TO AND 

REPRESENTATIVE OF THE
ESTATE

OF AMARISSA GROTTIE,
DECEASED,

AND CODY GROTTIE,
INDIVIDUALLY

AND AS HEIR TO AND
REPRESENTATIVE

OF THE ESTATE OF AMARISSA
GROTTIE,

DECEASED

 

 

                                              ------------

 

           FROM THE 97TH
DISTRICT COURT OF MONTAGUE COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------








I.  INTRODUCTION

This is an interlocutory appeal in a medical
negligence suit challenging the trial court=s order
denying motions to dismiss filed by Appellants Nancy Benish, R.N., F.N.P.-C;
Christine Lashell Hopson, R.N.; and Leonard T. Dingler, M.D.  Because Appellees Amanda Grottie,
individually and as heir to and representative of the estate of Amarissa
Grottie, deceased, and Cody Grottie, individually and as heir to and
representative of the estate of Amarissa Grottie, deceased, timely filed
adequate expert reports, the trial court did not abuse its discretion by
overruling Appellants= objections to the reports or by
denying Appellants= motions to dismiss.  See Tex. Civ. Prac. & Rem. Code
Ann. '
74.351(b) (Vernon Supp. 2008). 
Accordingly, we will affirm.

II.  FACTUAL
AND PROCEDURAL BACKGROUND

Amanda and Cody Grottie filed suit against
Appellants after their twenty-two-month-old baby Amarissa Grottie died.  The Grotties alleged that they took Amarissa
to the emergency room at Nocona General Hospital, where she was negligently
treated and discharged by Appellants. 
Amarissa died twelve hours after discharge.








After filing suit, the Grotties timely filed an
eleven-page, single-spaced expert report by Craig A. Kennedy, M.D., FACEP,
FAAEM, along with his twenty-page, single-spaced curriculum vitae.  The Grotties also timely filed a nine-page,
single-spaced expert report by Nancy Cleveland, R.N., M.S.N., FNP-BC, along
with her two-page curriculum vitae.








Appellants each filed objections to both reports,
and Nurse Benish and Dr. Dingler filed motions to dismiss.[1]  Appellants claimed in the trial court, and
assert on appeal,[2]
that Dr. Kennedy=s and Nurse Cleveland=s
reports are inadequate.  All Appellants
claim that both Dr. Kennedy=s and
Nurse Cleveland=s reports are inadequate because
they fail to couch the standard of care violations discussed in the reports in
terms of Awilful and wanton negligence,@ which
Appellants claim is required by civil practice and remedies code section
74.153.  See Tex. Civ. Prac. &
Rem. Code Ann. ' 74.153 (Vernon 2005).  Dr. Dingler claims that Dr. Kennedy=s report
is inadequate because it purportedly makes only conclusory and inadequate
allegations concerning Dr. Dingler=s
standard of care violations and causation. 
Nurse Benish claims that Dr. Kennedy=s report
is inadequate because it makes only conclusory causation opinions as to her
alleged negligence.  Dr. Dingler and
Nurse Hopson claim that Dr. Kennedy is not qualified to opine on
causation.  And finally, all Appellants
claim that Nurse Cleveland was not qualified to render a causation opinion.[3]  After a hearing, the trial court overruled
Appellants= objections and denied their
motions to dismiss.  This appeal
followed.[4]

III.  STANDARD
OF REVIEW








We review a trial court=s denial
of a motion to dismiss for an abuse of discretion.  Jernigan v. Langley, 195 S.W.3d 91, 93
(Tex. 2006); Ctr. for Neurological Disorders, P.A. v. George, 261 S.W.3d
285, 290B91 (Tex.
App.CFort
Worth 2008, pet. filed); Maris v. Hendricks, 262 S.W.3d 379, 383 (Tex.
App.CFort
Worth 2008, pet. denied).  To determine
whether a trial court abused its discretion, we must decide whether the trial
court acted without reference to any guiding rules or principles; in other
words, we must decide whether the act was arbitrary or unreasonable.  Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 241B42 (Tex. 1985), cert. denied,
476 U.S. 1159 (1986).  Merely because a
trial court may decide a matter within its discretion in a different manner
than an appellate court would in a similar circumstance does not demonstrate
that an abuse of discretion has occurred. 
Id.  But a trial court has
no discretion in determining what the law is or in applying the law to the
facts, and thus Aa clear failure by the trial
court to analyze or apply the law correctly will constitute an abuse of discretion.@  Walker v. Packer, 827 S.W.2d 833, 840
(Tex. 1992); Ehrlich v. Miles, 144 S.W.3d 620, 624 (Tex. App.CFort
Worth 2004, pet. denied).

IV.  FAILURE TO OPINE THAT APPELLANTS ACTED AWILFULLY AND WANTONLY@

DOES NOT RENDER THE REPORTS INADEQUATE

 

Appellants argue that Dr. Kennedy=s and
Nurse Cleveland=s reports are inadequate because
the Grotties= claims Aare >emergency
medical care= claims governed by section
74.153 of the civil practice and remedies code@ and
that, consequently, in order to be adequate, any expert report must opine that
Appellants acted wilfully and wantonly. 
The Grotties respond first that Appellants did not provide emergency
medical care and second that section 74.153 is not applicable to section 74.351
expert reports.  We need not determine,
however, whether Appellants provided emergency medical care to Amarissa; the
plain language of section 74.153 of the statute defeats Appellants=
argument.[5]








Texas Civil Practice and Remedies Code section
74.153 is titled AStandard of Proof in Cases
Involving Emergency Medical Care@ and
provides as follows:

In a suit involving a health care liability claim
against a physician or health care provider for injury to or death of a patient
arising out of the provision of emergency medical care in a hospital emergency
department . . . the claimant bringing the suit may prove that the treatment or
lack of treatment by the physician or health care provider deviated from
accepted standards of medical care or health care only if the claimant shows by
a preponderance of the evidence that the physician or health care provider,
with wilful and wanton negligence, deviated from the degree of care and skill
that is reasonably expected of an ordinarily prudent physician or health care
provider in the same or similar circumstances.

Tex. Civ. Prac. & Rem. Code Ann. '
74.153.  Thus, the statute sets forth the
standard of proof at trial that is required in a health care liability
claim arising out of the provision of emergency medical care.  See id. 
An expert report, however, is statutorily required to provide only a
summary of the expert=s opinions regarding the
applicable standards of care, the manner in which the defendant=s
conduct did not meet those standards, and the causal relationship between that
failure and the injury, harm, or damages claimed.  Id. ' 74.351(r)(6).













Section 74.153=s
statutorily created standard of proof and the applicable medical standards
of care are not the same thing.  See
Bosch v. Wilbarger Gen. Hosp., 223 S.W.3d 460, 464 (Tex. App.CAmarillo
2006, pet. denied) (holding that A[a]s
used in the context of medical malpractice actions, the phrases >standard
of care= and >standard
of proof= are not
synonymous@ and rejecting the argument that
section 74.153 requires an expert to speculate in his report as to whether a
physician=s negligence was wilful and
wanton).  In a medical negligence cause
of action, the plaintiff must prove by competent testimony that the defendant=s
negligence proximately caused the plaintiff=s
injury; to do so, the plaintiff must prove four elements: (1) a duty by the
physician to act according to a certain standard, (2) breach of the applicable
standard of care, (3) an injury, and (4) a sufficient causal connection between
the breach of the standard and the injury. 
See Duff v. Yelin, 751 S.W.2d 175, 176 (Tex. 1988); Hart v.
Van Zandt, 399 S.W.2d 791, 792 (Tex. 1965). 
Thus, the medical standard of care is an element of a plaintiff=s
medical negligence cause of action, setting the standard against which the
factfinder measures the defendant=s
conduct.  See, e.g., Coan v.
Winters, 646 S.W.2d 655, 657 (Tex. App.CFort
Worth 1983, writ ref=d n.r.e.) (recognizing that A[t]he
medical standard of care is the threshold question in a medical malpractice
case and must be established so that the fact finder can determine whether the
doctor=s act or
omission deviated from the standard of care to the degree that it constituted
negligence or malpractice@).








Conversely, the standard of proof imposed by
section 74.153 requires proofCthat is,
evidence at trial that will more than likely be circumstantialCthat the
physician or health care provider=s mental
state or intent at the time of any deviation from the medical standard of care
was wilful and wanton.  See Tex.
Civ. Prac. & Rem. Code ' 74.153;
accord Lee Lewis Constr., Inc. v. Harrison, 70 S.W.3d 778, 785 (Tex.
2001) (explaining requirements of gross negligence may be proved by
circumstantial evidence).  The Texas
Supreme Court has explained repeatedly that it is a tortfeasor=s intent
or mental state that distinguishes between negligence, gross negligence,
knowing acts or omissions, wilful negligence, and intentional conduct.  See, e.g., Diamond Shamrock Ref. Co. v.
Hall, 168 S.W.3d 164, 164 (Tex. 2005) (AWhat
separates ordinary negligence from gross negligence is the defendant=s state
of mind.@); Tex.
Dep't of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 232 (Tex. 2004) (A[I]t is
the defendant=s state of mind[C]whether
the defendant knew about a peril but nevertheless acted in a way that
demonstrated that he did not care about the consequences[C]that
separates ordinary negligence from gross negligence.@); La.‑Pac.
Corp. v. Andrade, 19 S.W.3d 245, 246 (Tex. 1999) (same); St. Paul
Surplus Lines v. Dal-Worth Tank Co., 974 S.W.2d 51, 53 (Tex. 1998)
(recognizing a culpability continuum of gross negligence, knowingly, wilful,
and intentional, with gross negligence being the lowest mental state); see
also Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue, 271 S.W.3d 238, 263
(Tex. 2008) (holding that A[i]n
this case, the record fails to show the required clear and convincing evidence
of a state of mind so indifferent to peril as to elevate the hospital=s
conduct from negligence to gross negligence@).








Dr. Dingler and Nurse Hopson assert in their
reply brief that section 74.153=s wilful
and wanton negligence standard of proof Ais
synonymous with gross negligence.@  Assuming Appellants are correct, they have not
cited, and we have not located, any authority for the proposition that to
prevent dismissal of a gross negligence pleading in a health care liability
claim, a statutory expert report must offer an opinion that a health care
provider=s act or
omissionCwhen
viewed objectively from the standpoint of the actor at the time of its
occurrenceCAinvolve[d]
an extreme degree of risk, considering the probability and magnitude of the
potential harm to others,@ and that the health care
provider had Aactual, subjective awareness of
the risk involved, but nevertheless proceed[ed] with conscious indifference to
the rights, safety, or welfare of others.@  Tex. Civ. Prac. & Rem. Code Ann. '
41.001(11) (Vernon 2008) (setting forth the definition of Agross
negligence@).  Indeed, in light of the limited discovery
permitted before an expert report is filed and in light of the proof necessary
to establish a health care provider=s
objective understanding of a risk and his subjective disregard of that risk, it
is doubtful that an expert preparing a section 74.351 report would ever be able
to offer an opinion that a health care provider acted with the requisite state
of mind to establish gross negligence or wilful and wanton negligence.  See id. '
74.351(s), (u) (authorizing only limited discovery before an expert report is
filed); Bosch, 223 S.W.3d at 464 (explaining that in light of this
limited discovery, an opinion set forth in a section 74.351 expert report
concerning wilful and wanton negligence Awould
most likely be sheer speculation@).








Although Dr. Dingler and Nurse Hopson urge us to
equate wilful and wanton negligence with gross negligence, we decline to do so,
and we do not purport here to construe the term Awilful
and wanton negligence@ as used in section 74.153; it
appears that conflicting definitions may exist. 
Compare St. Paul Surplus Lines, 974 S.W.2d at 53 (setting
forth culpability continuum), with Dunlap v. Young, 187 S.W.3d
828, 836 (Tex. App.CTexarkana 2006, no pet.)
(equating wilful and wanton negligence with gross negligence), and State
v. Crawford, 262 S.W.3d 532, 541 (Tex. App.CAustin
2008, no pet.) (explaining that A[t]he
term >willful= [sic]
in a statute is >a word of many meanings, its
construction often being influenced by its context=@ and
quoting Paddock v. Siemoneit, 147 Tex. 571, 218 S.W.2d 428 (1949), which
quotes Spies v. United States, 317 U.S. 492, 497, 63 S. Ct. 364, 367
(1943)).  We hold only that, whatever
definition of wilful and wanton is utilized, section 74.153 requires proof at
trial of a mental state or state of mind beyond mere negligence
of the physician or health care provider at the time of the physician or health
care provider=s deviation from the medical
standard of care.  See Tex. Civ.
Prac. & Rem. Code ' 74.153.








Appellants nonetheless urge us to superimpose
section 74.153=s standard of proof
requirements onto the expert report requirements codified in section 74.351(r)(6).  But the rules of statutory construction
prevent us from doing so.  In construing
a statute, our objective is to determine and give effect to the legislature=s
intent.  In re M.N., 262 S.W.3d
799, 802 (Tex. 2008); City of San Antonio v. City of Boerne, 111 S.W.3d
22, 25 (Tex. 2003); Nauslar v. Coors Brewing Co., 170 S.W.3d 242, 252B53 (Tex.
App.CDallas
2005, no pet.).  If a statute=s
language is unambiguous, we generally interpret the statute according to its
plain meaning.  Nauslar, 170
S.W.3d at 253.  We begin by examining the
exact wording and apply the tenet that the legislature chooses its words carefully
and means what it says.  See In re
M.N., 262 S.W.3d at 802; Nauslar, 170 S.W.3d at 253.  We determine legislative intent from the
entire act and not just isolated portions. 
Nauslar, 170 S.W.3d at 253.  
In determining the meaning of a statute, a court must consider the
entire act, its nature and object, and the consequences that would follow from
each construction.  Sharp v. House of
Lloyd, Inc., 815 S.W.2d 245, 249 (Tex. 1991); see generally Tex. Gov=t Code
Ann. '' 311.001B.034
(Vernon 2005) (Code of Construction Act setting forth presumptions and matters
to be considered in construing statute).

Here, the legislature made its intent in section
74.153 clear by carefully choosing the words Astandard
of proof@ rather
than Astandard
of care.@  The legislature intended, as it stated in
section 74.153, that a claimant Amay
prove@ a
departure from the standard of care in providing emergency medical care only if
the claimant shows that the physician or health care provider Awith
wilful and wanton negligence@
deviated from the standard of care.  Tex.
Civ. Prac. & Rem. Code '
74.153.  Thus, the legislature prescribed
a claimant=s burden of proof at trial in
a case involving emergency medical care. 
See Dill v. Fowler, 255 S.W.3d 681, 684 (Tex. App.CEastland
2008, no pet.) (couching the statutory language as a Astandard
of care@ but
applying it in a no-evidence summary judgment context as a burden of proof); see
also Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873,
878 (Tex. 2001) (holding that statutory expert report Aneed not
marshal all the plaintiff=s proof@).  The plain language of section 74.153 does not
purport to alter the medical standards of care applicable to emergency medical
care.













Considering the entire act, we note that despite
the enactment of section 74.153, the legislature did change section
74.351(r)(6), which sets forth the requirements of an expert report.  The legislature could have added a sentence
to section 74.351(r)(6) requiring an expert report in an emergency medical care
case to opine that the physician or health care provider acted with wilful and
wanton negligence.  But the legislature
did not do so, and nothing in the unambiguous language of section 74.153
indicates such an intent.[6]  In fact, in subsection (j) of section 74.351,
the legislature expressly forbid the imposition of extra requirements on expert
reports; the legislature provided, ANothing
in this section [section 74] shall be construed to require the serving of an
expert report regarding any issue [i.e., here, a wilful and wanton mental
state] other than an issue relating to liability or causation.@  Tex. Civ. Prac. & Rem. Code Ann.
74.351(j).  Nothing in our review of the
entire act indicates that the legislature intended section 74.153 to alter the
expert report requirements it set forth in section 74.351(r)(6).

And finally, as we have already alluded to, Appellants=
construction of section 74.153 would have the absurd consequence of requiring a
claimant to obtain an expert opinion on a physician=s or
health care provider=s mental state at the time he or
she was negligent after reviewing only very limited discovery.  See Tex. Gov=t Code
Ann. '
311.023(5) (recognizing that consequences of particular construction may be
considered in construing statute); Tex. Civ. Prac. & Rem. Code Ann. '
74.351(s), (u) (authorizing only limited discovery before an expert report is
filed); Bosch, 223 S.W.3d at 464 (explaining impossibility of obtaining
such an opinion in light of statutorily limited discovery).








For these reasons, we decline Appellants= request
that we judicially rewrite the statute to superimpose section 74.153=s wilful
and wanton standard of proof at trial upon the criteria for expert reports set
forth by the legislature in section 74.351(r)(6).  We hold that the trial court did not abuse
its discretion by overruling Appellants=
objections asserting that Dr. Kennedy=s and
Nurse Cleveland=s reports were inadequate
because they did not offer opinions that Appellants=
standard of care violationsCoutlined
and discussed in the reportsCwere
performed wilfully and wantonly.  We
likewise hold that the trial court did not abuse its discretion by denying
Appellants= motion to dismiss on this
basis.  We overrule Dr. Dingler and Nurse
Hopson=s
subissues 1(a), 1(b), and the first portion of their subissue 1(c).[7]  We also overrule Nurse Benish=s issue
2.

                            V.  THE EXPERT REPORTS ARE ADEQUATE

A trial court must grant a motion to dismiss
based on the alleged inadequacy of an expert report only if it finds, after a
hearing, that Athe report does not represent an
objective good faith effort to comply with the definition of an expert report@ in the
statute.  Tex. Civ. Prac. & Rem. Code
Ann. ' 74.351(l).  An expert report Aneed not
marshal all the plaintiff=s proof.@  Palacios, 46 S.W.3d at 878 (construing
former art. 4590i, ' 13.01).  It must simply provide a fair summary of the
expert=s
opinions as to the Aapplicable standards of care,
the manner in which the care rendered by the physician or health care provider
failed to meet the standards, and the causal relationship between that failure
and the injury, harm, or damages claimed.@  Tex. Civ. Prac. & Rem. Code Ann. ' 74.351(r)(6).








To constitute a good faith effort, the report
must Adiscuss
the standard of care, breach, and causation with sufficient specificity to
inform the defendant of the conduct the plaintiff has called into question and
to provide a basis for the trial court to conclude that the claims have merit.@  Palacios, 46 S.W.3d at 875.  A report does not fulfill this requirement if
it merely states the expert=s
conclusions or if it omits any of the statutory requirements.  Id. at 879.  But the information in the report Adoes not
have to meet the same requirements as the evidence offered in a summary‑judgment
proceeding or at trial.@ 
Id.  The claimant=s expert
must incorporate enough information to fulfill two purposes: (1) inform the
defendant of the specific conduct the plaintiff has called into question, and
(2) provide a basis for the trial court to conclude the claims are
meritorious.  Id.








When reviewing the adequacy of a report, the only
information relevant to the inquiry is the information contained within the
four corners of the document.  Id.
at 878.  This requirement precludes a
court from filling gaps in a report by drawing inferences or guessing as to
what the expert likely meant or intended. 
See id.  However, section
74.351 does not prohibit experts, as opposed to courts, from making
inferences based on medical history.  Marvin
v. Fithian, No. 14‑07‑00996‑CV, 2008 WL 2579824, at *4
(Tex. App.CHouston [14th Dist.] July 1,
2008, no pet.) (mem. op.); see also Tex. R. Evid. 703 (providing that an
expert may draw inferences from the facts or data in a particular case); Tex.
R. Evid. 705 (providing that expert may testify in terms of opinions and
inferences).

A.     Dr. Kennedy=s
Opinions Concerning the Standard of Care Violations by Dr. Dingler

Dr. Dingler argues that Dr. Kennedy did not
explain how Dr. Dingler directly breached the standard of care for either an
emergency medical care claim or a nonemergency medical care claim.  To the extent Dr. Dingler claims Dr. Kennedy
was required to opine that Dr. Dingler acted wilfully and wantonly, we have
overruled that contention as set forth above. 
To the extent Dr. Dingler complains that Dr. Kennedy=s report
does not explain Dr. Dingler=s
breaches of a standard of care, we address this contention below.

Dr. Kennedy=s report
contains the following:








The standard of care for a physician who
supervises mid-level practitioners (Nurse Practitioners and Physician
Assistants) requires that the physician provide adequate supervision, training
and monitoring to ensure that the Nurse Practitioner performs appropriate
histories and physical examinations.  The
standard of care requires the supervising physician to have a clear
understanding and agreement regarding what methods of treatment the mid-level
provider will use for common conditions such as gastroenteritis, vomiting,
diarrhea and dehydration.  The standard
of care requires the supervising physician to provide clear instructions (i.e.
protocols) to confer with the supervising physician when the mid-level
practitioner has a plan to discharge a patient without following the
established and agreed upon methods of treatment.  Since the supervising physician is
responsible for the medical care that is rendered by the mid-level practitioner
under his supervision, he must make sure that the mid-level provider has
adequate education, training and experience to provide competent medical care.

The standard of care for
a physician supervising a Nurse Practitioner who is treating a young child in
the emergency department with a history of vomiting and diarrhea requires that
the physician ensure that the Nurse Practitioner has obtained an adequate history.  This would include information regarding the
duration, severity and quantity of the vomiting and diarrhea, and the order in
which the symptoms developed, the presence or absence of fever, the consistency
and content of stools, [and] the child=s recent intake, appetite and ability to keep
food and fluids down.  The standard of
care requires that the physician ensure that the Nurse Practitioner conducted
an appropriate physical examination of the child including assessment of mental
status (including signs of lethargy or anxiety), a full set of vital signs,
assessment of skin turgor (including whether mucous membranes are moist or dry
and whether the eyes are sunken), a general assessment of the ears, throat, heart,
lungs, abdomen and extremities and assessment of weight with a comparison of
the child=s usual weight.

 

The standard of care requires that [] when there
is a significant decrease in the child=s weight
(i.e. over 6%) and the child appears ill, that a urine specific gravity or
other serum studies (electrolytes, blood urea nitrogen and creatinine) be
obtained to further clarify the child=s actual
fluid status. 








The standard of care requires that children with
moderate dehydration (6% to 9%) be kept in the ER (or another supervised
setting such as a physician=s office
or urgent care center) to be given oral replacement therapy (ORT).  The dehydration is corrected by giving at
least 60-120 ml/hr by mouth over approximately a four (4) hour period.  Following this therapy, the child=s
hydration should be reassessed.  The
child should not be discharged from the ER until the oral hydration therapy has
been successfully given.  If the oral
replacement therapy is not successful due to intolerance to oral intake or
excessive continued losses, the child should be given IV fluids and evaluated
for admission if necessary.

The standard of care requires that the
supervising physician ensure that a Nurse Practitioner working under his
supervision be aware that the administration of Benadryl or other medications
that cause drowsiness are not indicated for the treatment of vomiting and
diarrhea due to acute gastroenteritis.

The standard of care
requires that the physician provide adequate training and supervision to ensure
that the nurse practitioner knows how to provide adequate discharge
instructions.

 

DEVIATIONS
BY DR DINGLER:

 

It is my opinion that Dr.
Dingler fell below the standard of care and was negligent by failing to provide
adequate supervision of Nurse Practitioner Benish.  Based upon the numerous deficiencies in Nurse
Practitioner Benish=s history and physical
examination of Amarissa, it is clear that Dr. Dingler did not ensure that this
Nurse Practitioner knew how to take an adequate history and physical examination.  Since Nurse Practitioner Benish did not
follow accepted protocols (i.e. administration of oral replacement therapy for
moderate dehydration) to treat Amarissa, Dr. Dingler did not ensure that Nurse
Practitioner Benish had adequate training and experience to diagnose and treat
complications of acute gastroenteritis including dehydration.

 








Dr. Dingler fell below
the standard of care and was negligent by failing to ensure that Nurse
Practitioner Benish obtained an adequate history including the duration,
severity and quantity of the vomiting and diarrhea, the order in which the
symptoms developed, the presence or absence of fever, the consistency and
content of stools and Amarissa=s recent intake, appetite and ability to keep
food and fluids down.  Dr. Dingler fell
below the standard of care and was negligent by failing to ensure that Nurse
Practitioner Benish conducted an appropriate physical examination of Amarissa
including assessment of mental status (including signs of lethargy or anxiety),
complete vital signs (including respiratory rate and blood pressure),
assessment of skin turgor (including whether mucous membranes are moist or dry
and whether the eyes are sunken) and assessment of weight with a comparison of
Amarissa=s usual weight.

 

Dr. Dingler was below the standard of care and
[was] negligent because he allowed Amarissa to be discharged from the ER
without a urine specific gravity being ordered even though she had a history
consistent with dehydration (10 episodes of vomiting and diarrhea), symptoms of
moderate dehydration (anxiety and ill appearing) and a significant decrease in
Amarissa=s weight
(i.e. nearly 11%).  Dr. Dingler was below
the standard of care and negligent because he allowed Amarissa to be discharged
from the ER without administration of oral replacement therapy (ORT).  Dr. Dingler was below the standard of care
and negligent because he allowed Amarissa to be discharged from the ER without
adequate discharge instructions regarding the signs and symptoms of
dehydration, without adequate instructions for home oral replacement therapy
and with specific instructions for Amarissa to be given Benadryl every 6-8
hours.

On appeal, Dr. Dingler asserts that Dr. Kennedy
did not provide a fair summary of Dr. Dingler=s
negligence.  Dr. Dingler claims that Dr.
Kennedy Aneeded
to provide some factual information that Dr. Dingler did not train, supervise,
or monitor Nurse Benish, rather than merely express an ipse dixit opinion that
because Nurse Benish allegedly breached the standard of care, she must not have
been trained or supervised properly.@  But Dr. Kennedy=s report
does provide a fair summary of Dr. Dingler=s
alleged standard of care violations and does provide specific allegations of
standard of care violations by Dr. Dingler, not just Nurse Benish.













To recap the standard of care portions of Dr.
Kennedy=s report
set forth above concerning Dr. Dingler, Dr. Kennedy set forth at least two
specific standard of care violations by Dr. Dingler:  (1) he failed to adequately supervise and
train Nurse Benish by (a) failing to ensure she knew how to take an adequate
medical history, (b) failing to ensure she knew how to perform an adequate
physical exam, and (c) failing to adequately train her on recognition and
treatment of dehydration;[8]
and (2) discharging Amarissa (a) without a urine specific gravity study being
ordered, (b) without implementing oral replacement therapy at the hospital or
providing instructions for it at home and (c) with instructions for the
administration of Benadryl.  After
setting forth these standard of care violations, Dr. Kennedy=s report
sets forth the conduct that the standard of care required in the taking of a
medical history:  taking an adequate
history Athat
included the duration, severity and quantity of the vomiting and diarrhea, the
order in which the symptoms developed, the presence or absence of fever, the
consistency and content of stools and Amarissa=s recent
intake  . . . .@  Dr. Kennedy=s report
then sets forth the conduct that is required to meet the standard of care in
the taking of a medical exam: Aassessment
of mental status . . . , complete vital signs (including respiratory rate and
blood pressure), assessment of skin turgor (including whether mucous membranes
are moist or dry and whether the eyes are sunken) and assessment of weight with
a comparison of Amarissa=s usual weight.@  The report then sets forth the treatment that
should have been given to meet the standard of careCAadministration
of a urine specific gravity study and oral replacement therapy@ based
on ten episodes of vomiting and diarrhea, symptoms of moderate dehydration, and
an 11% decrease in weightCand opines that Dr. Dingler=s
conduct in allowing Amarissa=s
discharge without a urine specific gravity study and without oral replacement
therapy at the hospital or instructions for it at home and with instructions
for administration of Benadryl fell below the standard of care.








For the purpose of a statutory expert report,
statements concerning the standard of care and breach need only identify what
care was expected and was not given with such specificity that inferences need
not be indulged to discern them.  See
Palacios, 46 S.W.3d at 880; Thomas v. Alford, 230 S.W.3d 853, 858
(Tex. App.CHouston [14th Dist.] 2007, no
pet.).  Dr. Kennedy=s report
meets this requirement.  We hold that the
trial court did not abuse its discretion by determining that Dr. Kennedy=s report
was adequate in this regard.  We overrule
the second portion of Dr. Dingler and Nurse Hopson=s
subissue 1(c) dealing with Dr. Dingler.

B.     Dr. Kennedy=s
Opinions that the Standard of Care Violations by Dr. Dingler and Nurse Benish
Proximately Caused the Death of Amarissa

Nurse Benish claims in her first issue that Dr.
Kennedy=s
causation opinions are inadequate because they are conclusory.  Dr. Dingler and Nurse Hopson claim in one
portion of their subissue 1(d) that Dr. Kennedy was Anot
qualified to opine regarding the cause of death@ and
that Dr. Kennedy=s causation opinions are Aconclusory.@  They claim that A[f]or
Dr. Kennedy to opine regarding Amarissa=s cause
of death, his CV and expert report need to establish he was qualified regarding
the specific issue of dehydration as a cause of death . . . .  Dr. Kennedy=s CV and
expert report merely state[] that he was a medical examiner from 1989 to 1996 .
. . and fail to explain how he is qualified to opine regarding the specific issue
of cause of death.@[9]













An expert is qualified to give opinion testimony
about the causal relationship between the injury claimed and the alleged
departure from the applicable standard of care if he is Aotherwise
qualified to render opinions on such causal relationship under the Texas Rules
of Evidence.@ 
See Tex. Civ. Prac. & Rem. Code Ann. '
74.351(r)(5)(C) (Vernon Supp. 2008), '
74.403(a) (Vernon 2005).  The Texas Rules
of Evidence provide that A[i]f scientific, technical, or
other specialized knowledge will assist the trier of fact to understand the
evidence or to determine a fact in issue, a witness qualified as an expert by
knowledge, skill, experience, training, or education may testify thereto in the
form of an opinion or otherwise.@  Tex. R. Evid. 702; see also Roberts v.
Williamson, 111 S.W.3d 113, 121B22 (Tex.
2003) (recognizing that while medical license does not automatically qualify
holder to testify as expert on every medical question, test is not whether
expert practices in a particular field of medicine, but rather whether offering
party has established that expert has knowledge, skill, experience, training,
or education regarding specific issue before court that would qualify expert to
give opinion on particular subject and holding that based on qualifications and
experience, pediatrician was qualified to opine on cause and effect of
neurological injuries).  We review a
trial court=s determination that an expert
is qualified under an abuse of discretion standard.  Mem=l
Hermann Healthcare Sys. v. Burrell, 230 S.W.3d 755, 757 (Tex. App.CHouston
[14th Dist.] 2007, no pet.) (citing Broders v. Heise, 924 S.W.2d 148,
151B52
(Tex.1996)).

Concerning his qualifications, Dr. Kennedy=s report
states, in part:

I obtained my medical
education and graduated from Oregon Health Sciences University in 1978.  I completed a Family Practice Residency at
Oregon Health Sciences University from 1978 to 1981.  Throughout my career I have worked as an
Emergency Department physician, a Family Practice physician, a County Medical
Examiner and an Associate Professor of Medicine.  I am board certified in Emergency Medicine, Family
Practice, and Forensic Medicine.  I am
currently licensed to practice medicine in the states of Texas and Oklahoma.

 

. . . .

 

I am knowledgeable with respect to the accepted standards of care for
the injuries suffered by Amarissa Grottie while under the care of Leonard
Dingler, M.D., Nancy Benish, FNP-C, L. Hopson, R.N. and the health care
providers at Nocona General Hospital based on my education, training and
experience.  I have extensive experience
treating pediatric patients in the emergency department including children who
have gastroenteritis, vomiting, diarrhea, dehydration and electrolyte
imbalance.  I have also diagnosed and
treated patients with fungal infections of the GI (gastrointestinal) tract.

 

The ASummary@ on the
first page of Dr. Kennedy=s curriculum vitae states, in
part:








Board certified in Emergency Medicine, Family
Practice and Forensic Medicine.  Fellowship
status in the two largest Emergency Medicine societies.  Broad experience in Emergency Department
management, having served as associate director and chairman of high volume
Emergency Departments.  Four years Family
Practice experience and over 20 years Emergency Medicine experience, having
seen over 100,000 patients.  Chairman of
several quality assurance (TQM/QI/PI) committees.








We cannot agree with Dr. Dingler and Nurse Hopson=s
argument that the trial court abused its discretion by determining that Dr.
KennedyCwho is a
physician licensed in Texas, who is board certified in emergency medicine and
in forensic medicine, who had practiced emergency medicine for over twenty
years, who had experience working as a county medical examiner, and who
explained that he had Aextensive experience treating
pediatric patients in the emergency department including children who have
gastroenteritis, vomiting, diarrhea, dehydration and electrolyte imbalance,@ like
AmarissaCwas
qualified to render an opinion, after reviewing Amarissa=s
medical records and autopsy results, that her death was caused by dehydration
that was not properly treated by Appellants. 
See, e.g., Gelman v. Cuellar, 268 S.W.3d 123, 128 (Tex. App.CCorpus
Christi 2008, pet. denied) (holding that A[u]nder
the Texas Rules of Evidence, the test is whether the offering party has
established that the expert has knowledge, skill, experience, training, or
education regarding the specific issue before the court@); McKowen
v. Ragston, 263 S.W.3d 157, 164 (Tex. App.CHouston
[1st Dist.] 2007, no pet.) (holding that standard of care expert Ais
qualified to testify in an area, as here, in which [he] has knowledge, skill,
training, and experience, and where the subject of the claim (here, an
infection from an AV graft) falls squarely within his medical expertise@); Kelly
v. Rendon, 255 S.W.3d 665, 673 (Tex. App.CHouston
[14th Dist.] 2008, no pet.) (deciding that a doctor was qualified to submit an
expert report on standard of care in part because the report indicated the
doctor had Aexperience treating patients
with the same condition@ as the claimant). Compare In
re McAllen Med. Ctr., No. 05-0892, 2008 WL 4051053, at *2 (Tex. Aug. 29,
2008) (orig. proceeding) (holding doctor not qualified to give opinions on
hospital=s
alleged negligent credentialing when her report contained Ano
reference to any of those [negligent credentialing] guidelines, or any
indication that she has special knowledge, training, or experience regarding
this process@).  We overrule this portion of Dr. Dingler and
Nurse Hopson=s subissue 1(d).








Dr. Dingler (in a portion of his subissue 1(d))
and Nurse Benish (in her first issue) assert that Dr. Kennedy=s report
is Aconclusory@
concerning causation.  To establish
causation, an expert report must provide information linking the defendant=s
purported breach of the standard of care to the plaintiff=s
injury.  See Tex. Civ. Prac. &
Rem. Code Ann. ' 74.351(r)(6); see also
Arkoma Basin Exploration Co. v. FMF Assocs. 1990-A, Ltd., 249 S.W.3d 380,
391 n.32 (Tex. 2008) (defining conclusory as A[e]xpressing
a factual inference without stating the underlying facts on which the inference
is based@).  To constitute a good faith effort to
establish the causal relationship element, the expert report need not marshal
all of the plaintiff=s proof, or present evidence as
if the plaintiff was actually litigating the merits.  See Bowie Mem=l Hosp.
v. Wright, 79 S.W.3d 48, 52B53 (Tex.
2002); Palacios, 46 S.W.3d at 878. 
No magic words such as Areasonable
medical probability@ are required for
compliance.  Wright, 79 S.W.3d at
53.  The report, however, must provide
enough information within the document to both inform the defendant of the
specific conduct at issue and to allow the trial court to conclude that the
suit has merit.  Id. at 52.

We have set forth Dr. Kennedy=s
opinions on Dr. Dingler=s standard of care
violations.  But Nurse Benish has not
challenged Dr. Kennedy=s opinions concerning her
alleged standard of care violations, so we have not set forth those opinions.  We do so here for purposes of analyzing
whether Dr. Kennedy=s causation opinions adequately
link Nurse Benish=s alleged standard of care
violations to Amarissa=s death.

Concerning Nurse Benish=s
standard of care violations, Dr. Kennedy opined:








The standard of care for
a nurse practitioner treating a nearly two year old child in the emergency
department with a history of vomiting and diarrhea requires that the Nurse
Practitioner understand that children with fluid and electrolyte disorders
require Ameticulous diagnostic
skills because serious illness may be overlooked with cursory examination or
treatment.@  (quote from Rosen=s Emergency Medicine:
Concepts and Clinical Practice, Editor John A. Marx, M.D., 2002).  The standard of care also requires that the
Nurse Practitioner obtain specific information from the parent or caregiver
regarding the duration, severity and quantity of the vomiting and diarrhea and
the order in which the symptoms developed. 
Information regarding the presence or absence of fever and the
consistency and content of stools should be obtained as well as the child=s recent intake, appetite
and ability to keep food and fluids down. 
The Nurse Practitioner should also obtain information about whether
other family members are ill, whether the child attends day care and whether
the child has recently traveled.

 

The standard of care
requires that the Nurse Practitioner conduct a physical examination of the
child that includes assessment of mental status (including signs of lethargy or
anxiety), vital signs on admission and discharge (including temperature, heart
rate, respiratory rate and blood pressure), assessment of skin turgor
(including whether mucous membranes are moist or dry and whether the eyes are
sunken) and a general assessment of the ears, throat, heart, lungs, abdomen and
extremities.  The standard of care
requires that a weight be obtained with a comparison of the child=s usual weight (according
to prior records or information from the parents).  When there is a significant decrease in the
child=s weight (i.e. over 6%)
and the child appears ill, the standard of care requires that a urine specific
gravity and other serum studies (electrolytes, blood urea nitrogen and
creatinine) be obtained to clarify the child=s actual fluid and electrolyte status.

 

The standard of care
requires that children with moderate dehydration (6% to 9%) be kept in the ER
(or another supervised setting such as a physician=s office or urgent care
center) to be given a trial of oral replacement therapy (ORT).  The dehydration is corrected by giving at
least 60-120 ml/hour over several hours. 
Following this therapy, the child=s hydration should be reassessed.  The child should not be discharged from the
ER until the oral hydration therapy has been successfully given.  If the oral replacement therapy is not
successful due to intolerance to oral intake or excessive continued losses, the
child should be given IV fluids and evaluated for admission if necessary.

 








The standard of care
requires that Nurse Practitioners be aware that the administration of Benadryl
or other medications that cause drowsiness is not indicated for the treatment
of vomiting and diarrhea due to acute gastroenteritis.  The Nurse Practitioner should be aware that
if a child is given Benadryl after discharge, the medication will likely make
the child drowsy and the parents will not be able to assess whether the child=s mental status and condition
is deteriorating due to a fluid and electrolyte imbalance.

 

The standard of care
requires that the Nurse Practitioner provide both written and oral discharge
instructions to the parent or caregiver. 
For a child that has been evaluated for multiple episodes of vomiting
and diarrhea that is being sent home, the discharge instructions must include
specific information regarding the signs and symptoms of dehydration and the
amount and types of fluid the child should be given at home.  The discharge instructions should indicate
potential signs of worsening dehydration such as:  dry lips and mouth, a dark color or a strong
smell to the urine, not urinating very often or very much, little or no tears
when crying, sunken eyes, not paying attention to toys or television, being
difficult to wake up, vomiting up nearly everything he/she drinks or eats or
feeling thirsty but drinking liquids makes the child vomit.  For a child with mild dehydration, the
discharge instructions should include information to give the child one or two
teaspoons every 5 minutes (approximately 1-2 ounces per hour) of an oral
rehydration solution, if the child does well, give bigger sips a little less
often (every 5-10 minutes).  Continue
this process until the child is no longer thirsty, has adequate urinary output
and is not showing any signs of dehydration.

 

DEVIATIONS
BY NURSE PRACTITIONER BENISH:

 








It is my opinion that
Nurse Practitioner Benish fell below the standard of care and was negligent by
failing to recognize that Amarissa was at least moderately dehydrated and
required, at a minimum, oral replacement therapy to be given in the ER.  Nurse Practitioner Benish failed to obtain
vital information from Ms. Grottie including the duration, quantity and
contents of Amarissa=s vomiting and the
quantity, frequency and consistency of her stools over the past few days.  She also fell below the standard of care by
failing to obtain and document information regarding the amount of Amarissa=s oral intake, appetite
and urinary output over the past few days. 
Nurse Practitioner Benish fell below the standard of care by failing to
obtain and document information regarding whether other family members were
ill, whether Amarissa attended day care and whether she had traveled recently.

 

Nurse Practitioner Benish
fell below the standard of care and was negligent by failing to obtain an
adequate physical assessment of Amarissa. 
Nurse Practitioner Benish did not adequately assess Amarissa=s mental status.  She did not document the presence or absence
of lethargy or anxiety.  Documentation
that a 21-month old child is Aalert and oriented@ is not adequate.  Nurse Practitioner Benish fell below the standard
of care by failing to obtain Amarissa=s respiratory rate, blood pressure and oxygen
saturation upon admission to the ER.  She
also failed to meet the standard of care by allowing Amarissa to be discharged
without a second set of vital signs including temperature, heart rate,
respiratory rate and blood pressure. 
Nurse Practitioner Benish was negligent by failing to assess and
document Amarissa=s skin turgor including
whether her eyes were sunken.

 








Nurse Practitioner Benish
deviated from the standard of care and was negligent when she failed to compare
Amarissa=s usual weight with the
weight obtained in the ER.  Ms. Grottie
informed the staff that Amarissa=s weight was down three pounds compared to the
last weight done in her pediatrician=s office. 
This weight reduction is consistent with severe dehydration because it
indicates that Amarissa had a nearly 11% weight reduction.  Since Amarissa Aappeared ill@ and Aanxious@ [and] had a weight
reduction consistent with severe dehydration, Nurse Practitioner Benish was
negligent when she failed to obtain lab studies (including urine specific
gravity and if abnormal serum electrolytes, serum creatinine and serum
BUN).  Based on reasonable medical
probability, I believe that Amarissa=s urine specific gravity and blood urea nitrogen
more than likely would have been consistent with moderate to severe
dehydration.  Nurse Benish was negligent
when she discharged Amarissa from the ER rather than initiating oral
replacement therapy with oral rehydration solution (such as Pedialyte) over
several hours.

 

Nurse Practitioner Benish
fell below the standard of care and was negligent when she instructed Ms.
Grottie to give Amarissa Benadryl 6.25 mg every six to eight hours and when she
failed to give specific written instructions about the signs and symptoms of
worsening dehydration (as listed above) and to return to the ER if Amarissa did
not tolerate the oral replacement therapy at home (approximately one cup or
more per hour until bedtime) or if she did not have an adequate urinary output
(i.e. wet diapers).

 

Dr. Kennedy=s report
contains the following opinions that the standard of care violations by Dr.
Dingler and Nurse Benish caused Amarissa=s death:

CAUSATION & INJURIES:

 

It is my opinion based on
reasonable medical probability that the negligence of Nurse Practitioner
Benish, Leonard Dingler, M.D. and the ER nurse (L. Hopson, R.N.) at Nocona
General Hospital proximately caused Amarissa Grottie=s death.  Based on reasonable medical probability, I
believe that Amarissa had vomiting and diarrhea secondary to acute
gastroenteritis.  By Sunday, March 13,
2005 she was moderately to severely dehydrated and needed treatment to replace
her fluid deficit.

 

The autopsy findings
constitute overwhelming evidence that Amarissa=s death was more than
likely proximately caused by inadequately treated dehydration.  Dr. Gofton [the Medical Examiner] found that
Amarissa appeared dehydrated with Amarkedly@ sunken eyes, had dry appearing conjunctive, had
no urine in her bladder and she had a postmortem BUN consistent with severe
dehydration (57 mg/dL).  The comparison
of Amarissa=s weight just prior to
her death to her usual weight indicates that she was more than likely
moderately to severely dehydrated while she was in the ER on March 13, 2005.

 








Amarissa also had fungal
esophagitis, but this infection does not usually cause any significant problems
and can easily be treated with an oral antifungal medication.  I do not believe that fungal esophagitis
caused Amarissa=s death although it may
have caused Amarissa to experience pain upon swallowing.

 

I believe that the
inadequate history and physical examination that was taken by the Nurse
Practitioner Benish and Nurse Hopson proximately caused Amarissa=s death.  If Nurse Practitioner Benish, Dr. Dingler or
Nurse Hopson would have obtained an adequate history from Ms. Grottie about the
quantity and frequency of her vomiting and diarrhea, they more than likely
would have realized that Amarissa was moderately to severely dehydrated and
needed a trial of oral replacement therapy in the ER.  I believe based on reasonable medical
probability that if Nurse Practitioner Benish, Dr. Dingler or Nurse Hopson
would have taken Amarissa=s respiratory rate and
blood pressure and conducted an adequate physical examination (including
assessment of skin turgor) they more than likely would have realized that
Amarissa was moderately to severely dehydrated and needed the trial of oral
replacement therapy in the ER, and if unsuccessful, intravenous fluids with
possible admission to the hospital.

 

I believe that the
inadequate and improper discharge instructions that were provided to Ms.
Grottie by Nurse Practitioner Benish, Dr. Dingler and Nurse L. Hopson
proximately caused Amarissa=s death.  I
believe that the two doses of Benadryl that were given to Amarissa upon the
advice of her health care providers more than likely made Amarissa appear
drowsy during the late afternoon and evening of March 13, 2005 so that her
mother did not attribute her lethargy to the dehydration.

 








Based on reasonable
medical probability, I believe that Amarissa=s death at 22 months of age was proximately
caused by the failure of her health care providers to provide appropriate
treatment of her dehydration.  Children
are frequently evaluated in the ER when they develop dehydration secondary to
vomiting and diarrhea caused by acute gastroenteritis.  Dehydration is easily treated with oral
replacement therapy or IV fluids. 
Amarissa Grottie=s death is unfortunate
because it could have been easily prevented with appropriate health care as
discussed above.

 

The opinions stated in
this report are based upon the information that was available to me when the
report was written, and upon my experience, training, background, as well as
the medical literature.  If additional information
is provided, I may change my opinions or may have additional opinions.

 








These opinions by Dr. Kennedy satisfactorily link
Dr. Dingler=s and Nurse Benish=s
purported breaches of the standards of care to Amarissa=s death.[10]  Dr. Kennedy specifically opined that the
negligence of both Dr. Dingler and Nurse Benish caused Amarissa=s
death.  He opined that Amarissa died due
to dehydration.  Dr. Kennedy opined that
the appropriate medical treatment for Amarissa, which no Appellant provided,
was Atreatment
for fluid deficit,@ first Aoral
replacement therapy in the ER, and if unsuccessful, intravenous fluids with
possible admission to the hospital.@  He then described in detail how Dr. Dingler=s and
Nurse Benish=s deviations from the applicable
medical standards of care[11]
proximately caused Amarissa=s
death.  Dr. Kennedy explained that if Dr.
Dingler or Nurse Benish had taken a proper medical history or had performed an
adequate physical examination, they Amore
than likely would have realized Amarissa was moderately to severely dehydrated.@  Dr. Kennedy then opined that based on reasonable
medical probability, Amarissa=s death
was proximately caused by the failure of her health care providers to provide
appropriate treatment of her dehydration and that dehydration is easily treated
with oral replacement therapy or IV fluids. 
Finally, Dr. Kennedy concluded, AAmarissa
Grottie=s death
is unfortunate because it could have been easily prevented with appropriate
health care as discussed above.@













Without restating every sentence in the causation
portion of Dr. Kennedy=s report set forth above, a
review of the above paragraphs demonstrates information sufficient enough to
inform Dr. Dingler and Nurse Benish of the specific conduct that the Grotties
have called into question and how that conduct purportedly caused Amarissa=s
death.  See, e.g., Wright, 79
S.W.3d at 52 (explaining that a report is sufficient on causation if it (1)
informs the defendant of the specific conduct the plaintiff has called into
question and (2) provides a basis for the trial court to conclude the claims
are meritorious).  Moreover, Dr. Kennedy=s
causation opinions are not conclusory because they specifically and extensively
set forth all of the facts on which they are based.  See, e.g., Arkoma Basin Exploration Co.,
249 S.W.3d at 392 n.32.  The trial court
did not abuse its discretion by refusing to find Dr. Kennedy=s
causation opinions as to Dr. Dingler and Nurse Benish inadequate; we overrule
this portion of Dr. Dingler=s fourth
issue[12]
and Nurse Benish=s first issue.  See Mosely v. Mundine, 249 S.W.3d 775,
781 (Tex. App.CDallas 2008, no pet.) (holding
expert report sufficient on causation element); Grindstaff v. Michie,
242 S.W.3d 536, 544 (Tex. App.CEl Paso
2007, no pet.) (same); Patel v. Williams, 237 S.W.3d 901, 906 (Tex. App.CHouston
[14th Dist.] 2007, no pet.) (same); Bidner v. Hill, 231 S.W.3d 471, 474
(Tex. App.CDallas 2007, pet. denied) (same).

C.     Challenges to Nurse Cleveland=s Report

In her third issue, Nurse Benish claims that
Nurse Cleveland was not qualified to offer an opinion on causation or on Athe
emergency room standard of care applicable to Nurse Benish.@  In a portion of their subissue 1(d), Dr.
Dingler and Nurse Hopson likewise contend that Nurse Cleveland is not qualified
to offer an opinion on causation.

Section 74.351(r)(5)(C) expressly provides that
an expert filing a statutory expert report must be Aa physician
who is otherwise qualified to render opinions on such causal relationship under
the Texas Rules of Evidence.@  See Tex. Civ. Prac. & Rem. Code
Ann. '
74.351(r)(5)(C) (emphasis added). 
Consequently, a nurse cannot offer an opinion in a statutory expert
report on causation.  See Kelly, 255
S.W.3d at 675B76.  Thus, we sustain the first portion of Nurse
Benish=s third
issue and this portion of Dr. Dingler and Nurse Hopson=s subissue
1(d).

We next address Nurse Benish=s
argument in her third issue that Nurse Cleveland was not qualified to offer an
opinion on Athe emergency room standard of
care applicable to Nurse Benish.@  Nurse Cleveland=s report
states the following:








I attended Tarrant County
College Fort Worth, Texas and obtained an Associate=s Degree for Nursing in
1994.  I have been a Registered Nurse in
the State of Texas from 1994 through the present.  I attended the University of Texas in
Arlington, Texas and obtained a Bachelor=s of Science in Nursing in 1996.  I was a staff Nurse at Dallas-Ft. Worth
Medical Center from 1994 to 2000.  I was
also the Director of the Medical Surgical and Pediatric Units in 1995 and
1996.  I returned to school at the
University of Texas in Arlington, Texas and obtained a Master of Science in
Nursing degree specializing as a Family Nurse Practitioner in 2001.  I became licensed in the State of Texas as an
Advanced Practice Nurse and board certified by the American Nurses
Credentialing Center in the area of family practice in 2002.  I have been a Family Nurse Practitioner at
Lake Arlington Family Medicine with Dr. Dennis Poquiz from January of 2002
through September of 2006 when I began my current employment with Medical-Edge
at the Mansfield Family Clinic.  I have
also worked from 2003 through 2007 as an Assistant Clinical Professor for the
University of Texas in Arlington, Texas and Texas Women=s University in Dallas,
Texas precepting Nurse Practitioner students at the place of my employment.

 

. . .
.

 

In my education, training
and work experience as a Family Nurse Practitioner and Registered Nurse, I have
had extensive experience managing the care of children with vomiting and
diarrhea due to acute gastroenteritis.  I
have diagnosed and treated numerous patients (including children) with
vomiting, diarrhea and dehydration from acute gastroenteritis.  In my role as an Assistant Clinical Professor
for the University of Texas in Arlington, I have provided teaching to Family
Nurse Practitioner students that have cared for children with vomiting,
diarrhea and dehydration.  The standard
of care for the evaluation and treatment of a child with mild to moderate
dehydration that does not require IV therapy is the same regardless if the care
is provided in an office setting or in an emergency department.  If a patient with severe dehydration is seen
in an office setting, the patient will usually be referred to the emergency
department for IV therapy and in-patient care.








Nurse Benish basically argues that because Nurse Cleveland has not
practiced in an emergency room setting, she is not qualified.

Section 74.351(r)(5)(B) sets forth the
qualifications of persons giving an opinion in a statutory expert report
concerning whether a nonphysician health care provider such as Nurse Benish
departed from accepted standards of health care.  See Tex. Civ. Prac. & Rem. Code
Ann. '
74.351(r)(5)(B).  That section authorizes
a person to give such an opinion if they are an Aexpert
qualified to testify under the requirements of Section 74.402.@  Id. 
Section 74.402(b) provides,

(b) In a suit involving a
health care liability claim against a health care provider, a person may
qualify as an expert witness on the issue of whether the health care provider
departed from accepted standards of care only if the person:

 

(1) is practicing health care in a field of practice that involves the
same type of care or treatment as that delivered by the defendant health care
provider, if the defendant health care provider is an individual, at the time
the testimony is given or was practicing that type of health care at the time
the claim arose;

 

(2) has knowledge of accepted standards of care for health care
providers for the diagnosis, care, or treatment of the illness, injury, or
conditions involved in the claim; and

 

(3) is qualified on the basis of
training or experience to offer an expert opinion regarding those accepted
standards of health care.








Id. '
74.402(b).  The statute does not require,
as Nurse Benish seems to argue, that Nurse Cleveland have practiced in an
emergency room setting in order to be qualified to render standard of care
opinions for the proper treatment of a child with vomiting and diarrhea.  Rather, the statute specifically provides
that a person is qualified if they are Apracticing
health care in a field of practice that involves the same type of care or
treatment as that delivered by the defendant health care provider.@  Id. (emphasis added).  Nurse Cleveland=s report
and curriculum vitae establish that she practices health care in a field of
practice that involves the same type of care or treatment as that delivered by
Nurse Benish.  Nurse Cleveland=s report
and curriculum vitae establish that she has thirteen years=
experience as a registered nurse, seven years= total
experience as a nurse practitioner, five years=
experience as a nurse practitioner in a family practice office setting, and
that she possesses Aextensive experience managing
the care of children with vomiting and diarrhea due to acute gastroenteritis.@ In
light of the controlling statutory language and Nurse Cleveland=s
education, training, and experience, we cannot conclude that the trial court
abused its discretion by determining that Nurse Cleveland was qualified to
offer opinions on the standard of care applicable to Nurse Benish.  We overrule the second portion of Nurse
Benish=s third
issue.








VI.  CONCLUSION








Viewing
the information set forth within the four corners of Dr. Kennedy=s and
Nurse Cleveland=s reports (and disregarding
Nurse Cleveland=s causation opinions), we hold
that the trial court did not abuse its discretion by determining that Dr.
Kennedy was qualified to offer causation opinions, that both reports provide a
fair summary of Dr. Kennedy=s and
Nurse Cleveland=s opinions as to the Aapplicable
standards of care, [and] the manner in which the care rendered by the physician
or health care provider failed to meet the standards,@ and
that Dr. Kennedy=s report provides a fair summary
of the causal relationship between the health care providers= failure
to meet the standards of care and the injury, harm, or damages claimed.  See Tex. Civ. Prac. & Rem. Code
Ann. ' 74.351(r)(6);
Palacios, 46 S.W.3d at 878. 
Having addressed all of Appellants= issues,
subissues, and arguments within the subissues and having either determined that
we need not reach Appellants=
arguments or overruled Appellants= issues,
subissues, or arguments within subissues (with the exception of Appellants=
assertion that Nurse Cleveland was statutorily disqualified from offering a
causation opinion), we affirm the trial court=s March
8, 2007 order overruling Appellants=
objections to Dr. Kennedy=s and Nurse Cleveland=s
reports and denying Appellants= motions
to dismiss.

 

SUE WALKER

JUSTICE

 

 

PANEL: GARDNER and WALKER, JJ.; and DIXON W. HOLMAN, J. (Senior
Justice, Retired, Sitting by Assignment).

 

DELIVERED: February 19,
2009











[1]Nurse Hopson filed
objections but did not file a motion seeking dismissal.  Nonetheless, the trial court=s order expressly refused
to dismiss the claims against her and she perfected an appeal, so we will
address her issues.





[2]Dr. Dingler and Nurse
Hopson filed a joint brief on appeal. 
Some contentions in Dr. Dingler and Nurse Hopson=s brief apply to both of
them, and some apply only to Dr. Dingler or only to Nurse Hopson.  We refer to their brief on the basis of to
whom the argument applies.  Nurse Benish
filed a separate brief.





[3]Dr. Dingler and Nurse
Hopson=s brief raises one issue
but asserts four subissues and numerous arguments within each subissue.  Nurse Benish=s brief raises three
issues.





[4]See Lewis v. Funderburk, 253 S.W.3d 204, 208
(Tex. 2008) (authorizing appeal from trial court order determining that expert
report was adequate and denying motion to dismiss).





[5]Because we do not decide
whether Appellants provided emergency medical care, we do not address the
portions of Dr. Dingler and Nurse Hopson=s subissues arguing that Amarissa was not Astable@ when she arrived at the
emergency room on the day of her death; we likewise need not address the
Grotties= argument that the wilful
and wanton negligence standard of proof is an affirmative defense or a plea in
avoidance that Appellants waived by not pleading.





[6]Dr. Dingler urges us to
apply Athe doctrine of last
antecedent@ to hold that the phrase Awilful and wanton
negligence@ as used in section
74.153 modifies Adeviated from the degree
of care and skill that is reasonably expected of an ordinarily prudent
physician or health care provider in the same or similar circumstances.@  Applying the doctrine of last antecedent,
however, does not alter the plain language of section 74.153; the statute, even
applying the doctrine of the last antecedent, sets forth a standard of proof
for a health care provider=s intent or mental state that is applicable at
trial but does not alter the medical standards of care that an expert must
set forth in an expert report.  See
Tex. Civ. Prac. & Rem. Code Ann. ' 74.351(r).





[7]The joint brief filed by
Dr. Dingler and Nurse Hopson contains no arguments challenging any substantive
aspect of Dr. Kennedy=s or Nurse Cleveland=s reports concerning
Nurse Hopson except based on the wilful and wanton negligence issue; Nurse
Hopson does join Dr. Dingler=s arguments that neither Dr. Kennedy nor Nurse Cleveland
were qualified to testify on causation.





[8]In one subpart of one
subissue, Dr. Dingler appears to argue that these standard of care violation
allegations constitute an allegation of Avicarious@ liability against Dr. Dingler.  We cannot agree; the portions of Dr. Kennedy=s report concerning Dr.
Dingler allege specific acts or omissions by Dr. Dingler himself.  Moreover, if the Grotties had asserted a
theory of vicarious liability against Dr. Dingler for Nurse Benish=s negligence, an expert
report addressing only Nurse Benish=s negligence would have been sufficient.  See, e.g., Univ. of Tex. Med. Branch v.
Railsback, 259 S.W.3d 860, 867B68 (Tex. App.CHouston [1st Dist.] 2008, no pet.) (recognizing
proposition and citing other courts of appeals cases so holding).





[9]No Appellant challenges
Dr. Kennedy=s qualifications to opine
on the standards of care or on any Appellant=s alleged departure from them.  See Tex. Civ. Prac. & Rem. Code
Ann. '' 74.351(r)(5)(B),
.402(b), (c) (Vernon 2005) (setting forth qualifications for experts opining on
standards of care and whether defendant departed from them).





[10]Nurse Hopson has not
challenged in any argument on appeal Dr. Kennedy=s causation opinions
linking her alleged negligence to Amarissa=s death.





[11]As we previously
mentioned, Dr. Kennedy=s opinions concerning
Nurse Benish=s and Nurse Hopson=s standard of care
violations are not challenged on appeal; we have overruled Dr. Dingler=s challenges to Dr.
Kennedy=s opinions concerning Dr.
Dingler=s standard of care
violations.





[12]In one subpart of their
fourth subissue 1(d), Dr. Dingler and Nurse Hopson contend that Dr. Kennedy=s causation opinions are
inadequate because Dr. Kennedy failed to adequately summarize how Appellants= acts, rather than an
intervening act after discharge, caused Amarissa=s death.  Whether Appellants are entitled to a new and
independent cause inferential rebuttal instruction will be determined by
evidence introduced at trial; an opinion defeating their entitlement to such an
instruction need not be included in a statutory expert report.  See, e.g., James v. Kloos, 75 S.W.3d
153, 161 (Tex. App.BFort Worth 2002, no
pet.); Hall v. Huff, 957 S.W.2d 90, 95 (Tex. App.BTexarkana 1997, pet.
denied); Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern
Jury Charges: Malpractice, Premises, Products PJC 50.4 (2006); see also Tex.
Civ. Prac. & Rem. Code Ann. ' 74.351(j) (expressly limiting opinions to be
included in expert report).

 

In yet
another argument in another subpart of subissue 1(d), Dr. Dingler and Nurse
Hopson claim that Dr. Kennedy=s report is inadequate because it Afails to explain how he
reached a different conclusion on the cause of death than the medical examiner.@  The autopsy results in the record indicate
that the medical examiner concluded that Amarissa=s cause of death was Aundetermined OSC [Other
Significant Causes]:  fungal esophagitis;
dehydration.@  Thus, the medical examiner did conclude that
dehydration was a significant cause of Amarissa=s death.  The trial court did not abuse its discretion
by refusing to find Dr. Kennedy=s report inadequate on this basis.